TIMOTHY G. KORNEGAY, Plaintiff v. ASPEN ASSET GROUP, LLC, C. STEVE CLARDY, MICHAEL H. CLARDY, CARLTON S. CLARDY, JR., ROCKING B. FARMS, LLC, BASIC ELECTRIC COMPANY, INC., and EARTH PRODUCTS COMPANY, LLC, Defendants

No. COA09-71

(Filed 1 June 2010)

**1. Employer and Employee— compensation—existence of agreement—offer and acceptance**

In a contract action over disputed employment compensation, there was sufficient evidence of an offer and acceptance to warrant denial of defendant's motion for JNOV where plaintiff testified that he was offered the job in a conversation with defendant Steve Clardy, with the written agreement to follow.

**2. Employer and Employee— existence of contract—reference to profits—not unduly vague**

The trial court did not err in denying the defendant's motion for a JNOV in an employment contract action that concerned the division of profits. Plaintiff's evidence was sufficient to require that a jury decide whether a contract existed; no case was found suggesting that a reference to "profits" in an alleged contract is not sufficiently specific or certain to give rise to a contract.

**3. Employer and Employee— contract—compensation provisions—divisible**

Two portions of a disputed employment contract concerning compensation were divisible where two promises by defendant Steve Clardy were in exchange for two distinct return promises by plaintiff. The promises were not interdependent in any way.

**4. Employer and Employee— wage and hour claim—bonus— notice of forfeiture**

In a wage and hour claim, there was nothing to suggest that a bonus was not due plaintiff under N.C.G.S. § 95-25.7 where defendants contended that plaintiff was notified that defendants were forfeiting the bonuses before plaintiff earned them. The General Assembly did not intend to allow a bonus or commission to be cancelled or forfeited with the use of a notice as vague as the memo in question here.

**5. Employer and Employee— compensation—bonuses for real estate investments—reasonable time for resale**

The trial court did not err by allowing plaintiff to proceed under the "reasonable time for resale" rule in an action involving bonuses for real estate investments.

**6. Employer and Employee— wage and hour claim—failure to pay bonuses—statute of limitations**

The trial court properly rejected defendant's statute of limitations defense to a wage and hour claim concerning the failure to pay bonuses.

**7. Discovery— sanction—additional time offered—witness made available for deposition**

The trial court did not abuse its discretion in choosing as a discovery sanction an order that plaintiff make the witness available for a deposition and that defendants could have additional time. The trial court prepared a well-reasoned order of 14 pages and included a careful discussion of why the trial court had reached its decision.

**8. Damages and Remedies— new trial denied—remittitur**

The trial court did not abuse its discretion by denying defendants' motion for a new trial on both liability and damages in an employment compensation action. The judgment was based on competent evidence, including both the jury's finding of a breach of contract and the amount of damages ultimately awarded as a result of the remittitur.

**9. Damages and Remedies— remittitur accepted—appeal on separate damages claim not barred**

A plaintiff who accepted remittitur of the jury damages on a contract claim was not barred from bringing a cross-appeal on liquidated damages and attorney fees on a wage and hour claim, which is a separate claim for relief with separate remedies.

**10. Employer and Employee— wage and hour claim—liquidated damages—decided by court rather than jury**

The trial court did not err in a wage and hour claim by deciding the issue of liquidated damages rather than submitting it to the jury. Plain statutory language requires the employer to show "to the satisfaction of the court" that its actions were in good faith and based on reasonable grounds.

KORNEGAY v. ASPEN ASSET GRP., LLC

[204 N.C. App. 213 (2010)]

**11. Constitutional Law— right to trial by jury—liquidated damages—property rights not involved**

A liquidated damages issue in a wage and hour claim was properly decided by the trial court where defendant asserted that the failure to submit the claim to the jury violated his constitutional right to a jury trial in actions respecting property. There is no basis for distinguishing between liquidated damages under the Wage and Hour Act and punitive damages and Rule 11 sanctions, which do not involve property rights and a constitutional right to a jury trial.

**12. Employer and Employee— wage and hour claim—waiver of defenses**

The issue of waiver of defenses to a wage and hour claim was not addressed where plaintiff impliedly consented to trial of the issue.

**13. Damages and Remedies— liquidated damages—denied**

The trial court did not err by denying plaintiff liquidated damages on an employment compensation claim where plaintiff's arguments required the adoption of his construction of the evidence concerning the existence of a contract. The trial court had denied plaintiff's motions for a directed verdict and a JNOV on that issue.

**14. Employer and Employee— compensation claim—findings—sufficiently specific**

Findings of fact were sufficiently specific where they were adequate to set out the factual basis for the trial court's conclusions and to explain its rationale.

**15. Attorney Fees— denial of motion—employment compensation action**

The trial court did not abuse its discretion by denying plaintiff's motion for attorney fees in an action involving employment compensation.

Appeal by defendants and cross-appeal by plaintiff from judgment entered 5 February 2008 and order and modified judgment entered 4 June 2008 by Judge Albert Diaz in Mecklenburg County Superior Court. Heard in the Court of Appeals 10 June 2009.

*Bishop, Capitano & Moss, P.A., by J. Daniel Bishop and Joseph W. Moss, Jr., for plaintiff.*

*James, McElroy & Diehl, P.A., by Gary S. Hemric, John S. Arrowood, John R. Buric, and Preston O. Odom, III, for defendants.*

GEER, Judge.

This appeal arises out of a dispute over an alleged bonus compensation scheme between plaintiff Timothy G. Kornegay and his employer, defendant Aspen Asset Group, LLC ("Aspen"), which is owned by defendants C. Steve Clardy ("Steve Clardy"), Michael H. Clardy ("Mike Clardy"), and Carlton S. Clardy, Jr. ("Chip Clardy"). Defendants have appealed from the trial court's denial of their motion for judgment notwithstanding the verdict ("JNOV"), contending plaintiff presented insufficient evidence of an enforceable oral contract. Because we believe the evidence, taken in the light most favorable to plaintiff, was sufficient to allow the jury to determine the existence of an enforceable oral contract, we affirm the trial court's denial of defendants' motion for JNOV.

Defendants also argue the trial court erred in remitting the jury's damages award rather than granting defendants' request for a new trial on both liability and damages. Based upon our review of the jury's verdict, the evidence, and the issues in dispute, we hold that the trial court did not abuse its discretion in denying a new trial on all issues.

Plaintiff has cross-appealed from the trial court's denial of his motion for attorneys' fees and liquidated damages under the North Carolina Wage and Hour Act ("NCWHA"). We hold that the trial court's findings of fact, which are supported by competent evidence, are sufficient to support its denial of liquidated damages and attorneys' fees.

## Facts

Plaintiff met the Clardys in the early 1970s when he attended high school with Mike and Chip Clardy. Steve Clardy, the father of Mike and Chip, was the boys' scoutmaster in their Boy Scouts troop. The Clardys own Aspen (an investment holding company that buys, sells, and manages real estate investments), as well as defendants Rocking B. Farms, LLC, Basic Electric Company, Inc., and Earth Products Company, LLC. The parties kept in touch over the years, and

when plaintiff left another job in May 1996, he sent the Clardys his resume and told them he was looking for work.

After receiving plaintiff's resume, Chip Clardy contacted plaintiff and indicated that Steve Clardy wanted to speak with him about a possible job opportunity. Plaintiff and Steve Clardy met approximately eight times between July and September 1996, discussing various ways that plaintiff might work for the Clardys. The content of those discussions is at the heart of the dispute in this case.

Plaintiff contends that in the course of those discussions, he and Steve Clardy entered into an oral employment contract. According to plaintiff, his duties under the contract were to identify and present to the Clardys attractive real estate investment opportunities and, if given approval, to acquire, modify, and resell or lease those properties for profit. In exchange, plaintiff would receive an annual salary of $72,000.00 and bonuses under a compensation scheme based on a system of "origination" and "implementation." "Origination" included scouting out available properties and determining which properties might be a good investment. "Implementation" involved plaintiff's performing required due diligence, closing the sale, and handling the improvements and leasing of the property. Plaintiff contends that he was supposed to receive 20% of the profits from investment projects he originated and implemented and would receive "fair" compensation for implementing investment projects that he did not originate.

Defendants, on the other hand, argue that the conversations between plaintiff and Steve Clardy were nothing more than negotiations and that the parties intended to enter into a written agreement at a later date. It is undisputed by the parties that no written agreement exists. Although plaintiff and Steve Clardy exchanged several drafts of an agreement, none of the drafts was ever agreed upon or signed.

Plaintiff worked for Aspen from 1 October 1996 through 25 June 2004. During his employment, Aspen paid plaintiff $72,000.00 annually, but never paid any bonuses. The parties agree that plaintiff originated eight properties for the Clardys. Plaintiff claims, however, that he also originated one more property, the Love property. After all of these properties had been acquired by Aspen, plaintiff, in one of his paychecks, received a handwritten note dated 27 June 2002 that stated:

Sal[ary] same as now 72,000.00 annual.

No Bonuses
No Commissions
No Nothing

    Until

Aspen sees fit & confident we are making money.

Subsequently, on 11 September 2003, Aspen sold three of the properties. The other six properties remained unsold as of the trial.

On 14 December 2004, plaintiff brought suit against defendants in Mecklenburg County Superior Court. Plaintiff alleged that Aspen breached their contract by failing to pay him bonuses of 20% of the profits of investments he originated and implemented and bonuses of a "fair" percentage of the profits of investments he implemented but did not originate. Plaintiff also asserted claims against all defendants for (1) violation of the NCWHA, (2) *quantum meruit*, and (3) fraud. The case was ultimately assigned to the Business Court.

Defendants moved for summary judgment on 5 April 2006, while plaintiff moved for partial summary judgment on 11 May 2006. On 27 September 2006, the trial court entered an order denying summary judgment on plaintiff's breach of contract claim for the 20% bonus on investments he originated and implemented, but granting summary judgment to defendants on plaintiff's breach of contract claim for the "fair" bonuses on investments he implemented but did not originate. The trial court permitted plaintiff to proceed against (1) all defendants under the NCWHA; (2) only Aspen, Rocking B. Farms, Basic Electric, and Earth Products in *quantum meruit*; and (3) only Aspen and Steve Clardy for fraud.

At the close of plaintiff's case at trial, the trial court directed a verdict in favor of Rocking B. Farms, Basic Electric, and Earth Products on all claims and in favor of all defendants on the fraud claim. The court further concluded that plaintiff was entitled only to nominal damages on the *quantum meruit* claim asserted against all defendants. The trial court denied renewed directed verdict motions at the close of all the evidence and submitted the surviving claims to the jury.

On 12 December 2007, the jury rendered its verdict, making special findings of fact. It found that plaintiff and Aspen had entered into a contract and that Aspen had breached that contract. It further

found that Steve and Mike Clardy, but not Chip Clardy, were statutory employers of plaintiff under the NCWHA. The jury next found that plaintiff had originated and implemented the Love property and that defendants could have sold the six unsold properties for a profit in the exercise of reasonable care and judgment. The jury concluded that plaintiff was entitled to damages in the amount of $996,147.60.

Plaintiff moved for entry of judgment on the jury's verdict and for an award of liquidated damages under the NCWHA in the amount of the verdict, for attorneys' fees in the amount of $315,802.21, and costs of $9,869.45. At the hearing on plaintiff's motion, plaintiff also submitted a request for prejudgment interest in the amount of $124,518.00.

On 5 February 2008, the trial court entered judgment on the jury's breach of contract verdict in the amount of $996,147.60. The court concluded that the breach of contract amount should also be considered wages under the NCWHA and that Aspen, Steve Clardy, and Mike Clardy were liable jointly and severally for the unpaid wages. With respect to the request for liquidated damages, the trial court found that defendants had acted in good faith in discharging their obligations and had a reasonable basis for believing that their refusal to pay bonuses was not in violation of the NCWHA. The trial court, therefore, exercised its discretion not to award liquidated damages. The court also declined to award attorneys' fees although it did grant the request for costs. The trial court awarded prejudgment interest as to the three properties that had actually been sold, but declined to award prejudgment interest as to the remaining six properties because the court could not determine when the bonuses on those properties became due. Finally, the court dismissed the claim for *quantum meruit* since the jury had awarded damages for breach of an express contract.

Defendants moved for JNOV or, in the alternative, for (a) a new trial on both liability and damages; (b) a new trial on damages; or (c) remittitur of the damage award. In an order entered 28 April 2008, the trial court concluded that it could not reconcile the jury's award of $996,147.60 with the evidence admitted at trial and plaintiff's request to the jury for $825,070.40. The trial court noted that plaintiff had objected to remittitur and, therefore, granted a new trial as to damages only.

Subsequently, in an order dated 29 May 2008, the trial court stated that plaintiff had clarified that he did not intend to object to remitti-

tur. The trial court, therefore, denied the motion for a new trial on both liability and damages, and stated that it would be entering an amended judgment. The modified judgment was signed on 29 May 2008 and awarded plaintiff damages in the amount of $825,070.40 with prejudgment interest on only $58,424.00 of the judgment. Defendants timely appealed, and plaintiff cross-appealed.

## Defendants' Appeal

### I. Motion for JNOV.

Defendants contend that the trial court erred in denying their motion for JNOV. "When determining the correctness of the denial [of a motion] for directed verdict or judgment notwithstanding the verdict, the question is whether there is sufficient evidence to sustain a jury verdict in the non-moving party's favor, or to present a question for the jury." *Davis v. Dennis Lilly Co.*, 330 N.C. 314, 323, 411 S.E.2d 133, 138 (1991) (internal citations omitted). "A motion for judgment notwithstanding the verdict should be denied if there is more than a scintilla of evidence to support the plaintiff's *prima facie* case." *Scarborough v. Dillard's Inc.*, 188 N.C. App. 430, 431, 655 S.E.2d 875, 876 (2008), *rev'd on other grounds*, 363 N.C. 715, 693 S.E.2d 640 (2009).

#### A. *Breach of Contract Claim.*

Defendants first argue that the trial court should have granted their motion for JNOV because plaintiff presented insufficient evidence to create a jury question as to the existence of an enforceable, divisible contract. As an initial matter, defendants' arguments raise two questions: (1) whether there was an offer and acceptance of the terms of employment, and (2) "if so, were the terms agreed upon sufficiently definite and certain to give rise to a contract enforceable by a court of law?" *Williams v. Jones*, 322 N.C. 42, 48, 366 S.E.2d 433, 437 (1988) (upholding trial court's denial of JNOV motion). We address each question separately.

##### 1. Whether there was offer and acceptance.

[1] Defendants first assert that the discussions between Steve Clardy and plaintiff were merely negotiations to see if they could agree on terms and that the parties intended to enter into a written contract at a later date, which never happened. Our courts have held that when "it appears that the parties are merely negotiating to see if they can agree upon terms, and that the writing is to be the contract, then

there is no contract until the writing is executed." *Elks v. North State Ins. Co.*, 159 N.C. 619, 624, 75 S.E. 808, 811 (1912).

Defendants primarily rely upon *Cole v. Champion Enters., Inc.*, 496 F. Supp. 2d 613 (M.D.N.C. 2007), *aff'd*, 305 Fed. Appx. 122 (4th Cir. 2008) (unpublished), in support of their position. In *Cole*, the employee sought to enforce an alleged oral agreement regarding conditions for his continued employment, while the defendant employer contended that no agreement had ever been reached. The district court acknowledged that, under North Carolina law, "where the evidence is sufficient to support plaintiff's contention that a definite oral agreement was made by the parties, the contract is complete even though the parties contemplated that they would ultimately reduce the agreement to writing." *Id.* at 621. Nevertheless, "if it appears that the parties are merely negotiating to see if they can agree upon terms, and that the writing is to be a contract, then there is no contract until the writing is executed." *Id.* at 622. On this point, the court observed: " 'If the parties intend to signal their agreement only by the execution of a written document and do not intend to be bound unless and until all parties sign, no amount of negotiation or oral agreement, no matter how specific, will result in the formation of a binding contract.' " *Id.* (quoting *Dow Chem. Co. v. Gen. Elec. Co.*, 2005 WL 1862418, \*32, 2005 U.S. Dist. LEXIS 40866, \*88 (E.D.Mich. Aug. 4, 2005)).

In deciding that no oral agreement was ever reached in *Cole*, the district court pointed out first that it was undisputed that the oral discussions could not constitute a verbal agreement because, given the nature of the employee's position, all terms of his employment were subject to approval by the Board of Directors. *Id.* at 624-25. Although the Board ultimately did approve some of the terms and conditions of employment, the district court concluded that the approval, while necessary, was not sufficient for a contract since several of the terms were too indefinite to be enforceable without further negotiations and, in any event, "the alleged contract that [the employee sought] to enforce differ[ed] in concept fundamentally from what the Board actually considered and approved." *Id.* at 625.

The court pointed out that, subsequently, the terms included within the Board approval (such as a salary increase) were not put into effect, but rather the parties exchanged draft agreements in which the employee sought revisions that were irreconcilable with the terms approved by the Board or were in addition to those terms. *Id.* at 627, 629. Moreover, in the course of those negotiations, none of the parties "suggested that some 'oral agreement' was already in

place." *Id.* at 629. Based on these facts, the district court concluded that the "undisputed facts all demonstrate the existence of ongoing negotiations, rather than a 'mere memorial' of an already agreed-upon contract." *Id.*

Recently, the same judge summarized the significant factors leading to the conclusion in *Cole* when distinguishing that opinion:

> Defendant, in arguing that no contract existed, urges this court to follow the reasoning of *Cole v. Champion Enterprises, Inc.*, 496 F.Supp.2d 613 (M.D.N.C.2007). While there is language in *Cole* supporting Defendant's position, the facts in *Cole* are inapposite. The plaintiff in *Cole* alleged that he had an oral employment agreement which was enforceable. The court, however, found that there was no agreement because, among other things, any such employment contract required corporate Board approval, which was never given, all previous employment contracts between the parties had been reduced to writing, and there was never a meeting of the minds on the terms of the agreement, as those terms were still being negotiated by the parties. As the Fourth Circuit noted in affirming the decision of the district court: "These negotiations prevented [the parties] from reasonably believing that they were already obligated by an enforceable agreement . . . ." *Cole v. Champion Enters., Inc.*, 305 F. App'x. 122, 129 (4th Cir.2008).

*TSC Research, LLC v. Bayer Chems. Corp.*, 2009 WL 2168965, *4 (M.D.N.C. July 16, 2009) (unpublished).

While defendants point to the fact that plaintiff and Steve Clardy anticipated reducing their agreement to writing, but did not do so, we believe, as was true in *TSC Research*, that the factors present in *Cole* are not present in this case. Since this was the first employment agreement, the parties had no prior practice of reducing contracts to writing, there was no evidence that plaintiff's agreement required approval by anyone apart from Steve Clardy, and plaintiff was not attempting to enforce terms beyond those addressed in his meeting with Steve Clardy.

Instead, there is sufficient evidence of an offer and acceptance to warrant denial of the motion for JNOV. Plaintiff testified that at the initial September meeting, Steve Clardy "offered [him] the job to originate to be a catalyst for, to initiate real estate investments, and to implement them." According to plaintiff, he and Steve Clardy dis-

**KORNEGAY v. ASPEN ASSET GRP., LLC**

[204 N.C. App. 213 (2010)]

cussed the terms Steve Clardy had offered, and plaintiff "accepted the terms." Steve Clardy then said that after plaintiff started work, they would get together and "write up the agreement that [they] already made." Plaintiff testified that after he began working for Aspen, he and Steve Clardy reviewed the terms they had agreed on, and Steve Clardy told plaintiff to "put into written form the agreement that we had made."

Steve Clardy testified that he and plaintiff orally agreed they would split the profits from properties plaintiff originated and implemented 80/20. He further explained:

> After we made what we thought was some kind of employment terms, then I told him that he and I and [another employee] would get together immediately. And I think we did that within 30 days. We met for about an hour or so on our first meeting.
>
> Q. What was the purpose of that three-way meeting with you, [plaintiff], and [the other employee]?
>
> A. For [plaintiff] and I to convey our thoughts to [the other employee] to put in writing.

Later, when Steve Clardy was asked, "Twenty percent of that is what you promised [plaintiff]?", he responded: "No. I never promised—yes. *That was our agreement, originally.* But we never came to an agreement. But yes, if our agreement had been consummated, yes." (Emphasis added.) It was up to the jury to decide whether this testimony acknowledged an oral agreement to later be memorialized in writing or whether these were just negotiations.

Defendants point to plaintiff's testimony about one of the written draft agreements that "[i]t was obvious in that agreement" that plaintiff and Steve Clardy "had differences with it." This testimony, when viewed in the light most favorable to plaintiff, does not require a conclusion, as in *Cole*, that the parties had not in fact reached an agreement and still were negotiating, but rather could be understood to mean either (1) that Steve Clardy was attempting, as plaintiff has contended, to alter the existing oral agreement or (2) that the parties were simply having difficulty reducing the agreed-upon terms to writing. Which construction was correct or whether there was no agreement in the first place was a question for the jury.

Our Supreme Court has held that "[w]here the evidence presented at trial is sufficient to support plaintiff's contention that a def-

inite agreement was made by the parties, the contract is complete even though the parties contemplated reducing the agreement to writing." *Williams*, 322 N.C. at 52, 366 S.E.2d at 440. In *Williams*, 322 N.C. at 47, 366 S.E.2d at 437, the plaintiff had appealed the trial court's granting of defendants' motion for JNOV, contending that a reasonable jury could conclude that a discussion between the plaintiff and the defendants constituted an oral contract. The Supreme Court agreed that the trial court erred, explaining that the record contained evidence that a firm offer was made by the defendants to give the plaintiff a sum of money in exchange for the right to sell the plaintiff's technology and that the plaintiff had accepted that offer. *Id.* at 49, 366 S.E.2d at 438. The Court reasoned that the "protestations of [defendants] that nothing more than preliminary negotiations were discussed merely contradicted plaintiff's testimony" and was an issue for the jury. *Id.* at 48, 366 S.E.2d at 438.

Similarly, here, the testimony from plaintiff and Steve Clardy is more than a scintilla of evidence that Steve Clardy made an offer to plaintiff regarding the employment terms and that plaintiff accepted that offer even though the parties intended to later have a written agreement. Defendants' assertion that those were preliminary negotiations "merely contradicted" that testimony and was, therefore, an issue for the jury. *See also N.C. Nat'l Bank v. Wallens*, 26 N.C. App. 580, 583-84, 217 S.E.2d 12, 15 (explaining that even if contracting parties expressly contemplate later written document, oral agreement becomes effective absent explicit statement by one of parties conditioning effectiveness on consummation of writing), *cert. denied*, 288 N.C. 393, 218 S.E.2d 466 (1975).

2. Whether the terms were sufficiently certain.

[2] Defendants next argue that even if the parties entered into an oral agreement to· split the profits 80/20 on properties that plaintiff originated and implemented, there was no enforceable contract because the reference to "profits" was not sufficiently specific, and the parties did not agree on what costs would be deducted from revenues to arrive at the profits.

In *Williams*, however, the Supreme Court concluded that when "the plaintiff presented evidence which demonstrates that the terms alleged by defendants to be indefinite were in fact sufficiently well delineated to all parties," it did not matter that it was "contested by defendants." 322 N.C. at 52, 366 S.E.2d at 440. Defendants' disagreement did not alter the fact that "[e]vidence which defined the terms

in question was presented in [the] case." *Id. See also Chew v. Leonard*, 228 N.C. 181, 185, 44 S.E.2d 869, 872 (1947) (in considering alleged contract for payment of bonus if plaintiff caused $7,000.00 reduction in production costs, holding that agreement as to what constituted reduction in production costs was not necessary to enforce contract); *Arndt v. First Union Nat'l Bank*, 170 N.C. App. 518, 523, 613 S.E.2d 274, 278 (2005) (rejecting defendants' argument that " 'sketchy' " discussions were insufficient to comprise valid contract and finding sufficient plaintiff's evidence that manager orally told him he would receive bonus of 20% of all net income he earned for company).

Here, like the plaintiffs in *Williams, Chew,* and *Arndt,* plaintiff presented evidence that would permit the jury to decide that the terms of the alleged oral contract were sufficiently definite and certain. Plaintiff testified that Steve Clardy said: "I'll pay you a bonus which will be 20 percent of profits on the jobs you originate and implement[]." According to plaintiff's testimony, he and Steve Clardy further agreed that profits would be calculated by subtracting costs from revenues for jobs that plaintiff originated and implemented. Plaintiff explained that Steve Clardy defined revenues as money coming in from the sales and leasing of properties plaintiff originated and implemented and defined costs as any expenses specific to the job he worked on, including a prorated portion for office and administrative costs. Plaintiff testified that Steve Clardy then wrote out examples showing how bonuses would be calculated based on this formula.

As the Supreme Court held in *Williams,* plaintiff's evidence is sufficient to require that a jury decide whether a contract existed. The cases relied upon by defendants—*Rosen v. Rosen*, 105 N.C. App. 326, 413 S.E.2d 6 (1992), and *Braun v. Glade Valley School, Inc.*, 77 N.C. App. 83, 334 S.E.2d 404 (1985)—do not require a different result. In each of those cases, the plaintiff's evidence was lacking. In *Rosen*, 105 N.C. App. at 328, 413 S.E.2d at 8, the agreement, as proved by the plaintiff, was lacking a material term. In *Braun*, 77 N.C. App. at 84, 334 S.E.2d at 405, the plaintiff, a teacher, relied exclusively upon a letter that merely stated that the defendant school was " 'planning' " for the plaintiff to be a part of the faculty during the next school year. The Court in *Braun* upheld a directed verdict on the breach of contract claim because "[f]rom plaintiff's evidence, it is clear that the plaintiff and defendant Mackey never reached a mutual understanding as to salary, fringe benefits, length of employment,

duties and responsibilities, or housing arrangements." *Id.* at 89-90, 334 S.E.2d at 408.

Since, in this case, plaintiff offered affirmative evidence that the parties entered into an oral contract with sufficiently definite terms, the fact that defendants disputed that evidence was not sufficient under *Williams* to warrant entry of JNOV. We note further that defendants have failed to cite any decisions suggesting that an agreement to pay a percentage of "profits" is too vague to be enforced.

In our research, we have found no case in North Carolina or any other jurisdiction suggesting that a reference to "profits" in an alleged contract is not sufficiently specific or certain to give rise to a contract. *See Pratt v. Seventy-One Hawthorne Place Assocs.*, 106 S.W.3d 608, 614 (Mo. Ct. App. 2003) ("Therefore, the failure of the parties to define the term 'net profit,' a term commonly used . . . in contracts, does not render the contract too indefinite to be enforceable."). We, therefore, hold that the trial court did not err in denying the motion for JNOV on this basis.

### 3. Indivisible vs. Divisible Contract.

[3] Defendants next argue that their motion for JNOV should have been allowed because even if the parties did enter into an oral contract, the provision entitling plaintiff to 20% of the profits from projects he originated and implemented is indivisible from an unenforceable provision. Defendants point to the portion of the alleged oral contract providing that plaintiff would receive a "fair" share of the profits from projects he implemented, but did not originate, and argue that because the trial court concluded that the promise was unenforceable, the indivisible promise to pay plaintiff 20% of the profits for projects he originated and implemented must also fail.

" 'A contract is entire, and not severable, when by its terms, nature and purpose it contemplates and intends that each and all of its parts, material provisions, and the consideration, are common each to the other and interdependent.' " *Mebane Lumber Co. v. Avery & Bullock Builders, Inc.*, 270 N.C. 337, 341, 154 S.E.2d 665, 668 (1967) (quoting *Wooten v. Walters*, 110 N.C. 251, 254, 14 S.E. 734, 735 (1892)). On the other hand, " 'a severable contract is one in its nature and purpose susceptible of division and apportionment, having two or more parts, in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other, nor is it intended by the parties that they shall be.' " *Id.* at 342, 154 S.E.2d at 668 (quoting

*Wooten,* 110 N.C. at 255, 14 S.E. at 735). When a contract is severable, " 'an action may be maintained for a breach of it in one respect and not necessarily in another, or for several breaches, while in other material respects it remains intact." *Id.* (quoting *Wooten,* 110 N.C. at 255, 14 S.E. at 735).

In *Turner v. Atl. Mortgage & Inv. Co.,* 32 N.C. App. 565, 567-68, 233 S.E.2d 80, 82, *disc. review denied,* 292 N.C. 735, 235 S.E.2d 788 (1977), a bank employee alleged that he and his employer had an oral agreement under which he was given the option to purchase five percent of the shares of the bank's stock for four consecutive years. Commissions earned by the employee during those years would be applied toward the purchase price of the stock. *Id.* at 568, 233 S.E.2d at 82. When the bank discharged the employee without giving him his shares, he sued to recover either the amount of commissions he earned or the stock. *Id.* at 567, 233 S.E.2d at 81.

This Court held that even if the employee would be barred from suing for the stock by the statute of frauds, he could still sue for the commissions. The Court explained that "[t]he contract is divisible into two related, but not interdependent, promises: (1) to pay [the plaintiff] commissions in consideration of fees generated; and (2) to sell [the plaintiff] shares in consideration for, and in proportion to, the commissions already earned, and the number of years spent working for [the bank]." *Id.* at 571, 233 S.E.2d at 83.

Similarly, here, the two promises made by Steve Clardy were in exchange for two distinct return promises by plaintiff: (1) 20% of profits in exchange for origination and implementation of investment projects, and (2) fair treatment in exchange for implementation efforts on projects plaintiff did not originate. The two promises were not interdependent in any way and were, therefore, divisible.

B. *North Carolina Wage & Hour Act Claim.*

1. Forfeiture.

[4] With respect to the NCWHA claim, defendants first contend that even if an enforceable, divisible contract existed between the parties, plaintiff cannot recover the bonuses under the NCWHA because defendants notified him they were forfeiting the bonuses before plaintiff earned them. Additionally, defendants contend, as to the six unsold properties, that no bonus accrued because plaintiff's employment terminated prior to the selling of the properties. We disagree with both arguments.

The NCWHA provides:

> Employees whose employment is discontinued for any reason shall be paid all wages due on or before the next regular payday either through the regular pay channels or by mail if requested by the employee. Wages based on bonuses, commissions or other forms of calculation shall be paid on the first regular payday after the amount becomes calculable when a separation occurs. *Such wages may not be forfeited unless the employee has been notified in accordance with G.S. 95-25.13 of the employer's policy or practice which results in forfeiture. Employees not so notified are not subject to such loss or forfeiture.*

N.C. Gen. Stat. § 95-25.7 (2009) (emphasis added). N.C. Gen. Stat. § 95-25.13(3) (2009) in turn requires each employer to "[n]otify employees, in writing or through a posted notice maintained in a place accessible to its employees, at least 24 hours prior to any changes in promised wages."

Our courts have construed N.C. Gen. Stat. § 95-25.13(3) to mean that "[o]nce the employee has earned the wages and benefits . . ., the employer is prevented from rescinding them, with the exception that for certain benefits such as commissions, bonuses and vacation pay, an employer can cause a loss or forfeiture of such pay if he has notified the employee of the conditions for loss or forfeiture in advance of the time when the pay is earned." *Narron v. Hardee's Food Sys., Inc.*, 75 N.C. App. 579, 583, 331 S.E.2d 205, 208, *disc. review denied*, 314 N.C. 542, 335 S.E.2d 316 (1985).

On 27 June 2002, before any of the properties on which plaintiff worked were sold, defendants sent plaintiff a memo stating that they would not pay him any bonuses or commissions "until Aspen sees fit & confident we are making money." Defendants contend that under their agreement, plaintiff only "earned" a bonus on a property when that property was sold. Defendants reason that they, therefore, properly notified plaintiff of the forfeiture of the bonuses before he had earned the bonuses. Plaintiff, on the other hand, contends the bonuses were earned once he had originated and implemented the projects and those projects increased in value, thereby making a profit.

We need not resolve the issue of when the bonuses were earned because, in any event, the June 2002 memo on which defendants rely

was not sufficient notification to cause a forfeiture of the bonuses. The memo did not specify the "the conditions for loss or forfeiture" of plaintiff's bonuses. *Id.* The memo did not state that Aspen would never pay bonuses to plaintiff or that the bonuses would be lost or forfeited upon the occurrence of specified events, but rather stated "[n]o bonuses . . . until Aspen sees fit & confident we are making money." Plaintiff testified that when he got the memo, "it shocked me and I wasn't exactly sure whether it meant they were stopping the bonus or they were just saying the timing of the bonus would be to their discretion based on when they thought [they] were making money." The trial judge read the memo as "suggest[ing] until the properties are sold there's some other measure engaging that property. Not that there would never be a bonus paid."

Defendants have argued that "an employer may *eliminate a bonus* by providing the employee with written notice before the bonus accrues." (Emphasis added.) Yet, nothing in the memo states that Aspen is in fact eliminating the bonus. The regulations relating to the NCWHA provide that "[a]mbiguous policies and practices [relating to bonuses and commissions] shall be construed against the employer and in favor of employees." N.C. Admin. Code tit. 13, r. 12.0307(c). The memo must, therefore, be construed against Aspen and in favor of plaintiff with the result that this ambiguous memo does not constitute notice of forfeiture within the meaning of N.C. Gen. Stat. §§ 95-25.7, 95-25.13. We do not believe that our General Assembly intended to allow a bonus or commission to be cancelled or forfeited with the use of such a vague notice.

With respect to the six unsold properties, defendants further contend that plaintiff was not entitled to a bonus because his employment ended prior to the properties being sold. In *Narron*, 75 N.C. App. at 583, 331 S.E.2d at 208 (emphasis added), this Court held:

[G]iving the statutory language its natural and ordinary meaning, the Wage and Hour Act requires an employer to notify the employee in advance of the wages and benefits which he will earn and the conditions which must be met to earn them, and to pay those wages and benefits due *when the employee has actually performed the work required to earn them.* Once the employee has earned the wages and benefits under this statutory scheme, the employer is prevented from rescinding them, with the exception that for certain benefits such as commissions, bonuses and vacation pay, an employer can cause a loss or forfeiture of such

pay if he has notified the employee of the conditions for loss or forfeiture in advance of the time when the pay is earned.

We have already held that the June 2002 memo did not constitute written notice of loss or forfeiture. Defendants point to no other written notice or policy that plaintiff would not receive the bonus if his employment terminated prior to the sale of the properties he originated and implemented.

Questions remain, however, regarding (1) the nature of "the conditions which must be met to earn" the bonuses, and (2) whether plaintiff "actually performed the work required to earn" the bonuses. *Id.* Plaintiff presented evidence that he earned a 20% bonus when he originated and implemented a property and that property increased in value such that defendants would receive a profit if the property were sold. Plaintiff likewise presented evidence for each of the unsold properties that he "actually performed the work required to earn" the bonuses—the origination and implementation. *Id.* The fact that the properties increased in value met the only remaining condition for a bonus. Under *Narron*, defendants were, therefore, "require[d] . . . to pay those wages . . . ." *Id.*

Defendants, in arguing that no bonus was due, seek to impose an additional requirement that the bonus be "calculable" or "quantifiable" at the time of the termination of plaintiff's employment. This argument cannot be reconciled with the plain language of N.C. Gen. Stat. § 95-25.7, which expressly addresses the payment of wages upon the termination of an employee's employment:

> Employees whose employment is discontinued for any reason shall be paid all wages due on or before the next regular payday either through the regular pay channels or by mail if requested by the employee. *Wages based on bonuses, commissions or other forms of calculation shall be paid on the first regular payday after the amount becomes calculable when a separation occurs.* Such wages may not be forfeited unless the employee has been notified in accordance with G.S. 95-25.13 of the employer's policy or practice which results in forfeiture. Employees not so notified are not subject to such loss or forfeiture.

(Emphasis added.) If, as defendants urge, the bonus must be calculable as of the date of termination, then the sentence italicized above would be rendered meaningless. It is a fundamental principle of statutory construction that courts will not interpret a statute in a

manner that negates any portion of it. *See, e.g., State v. Ward,* 31 N.C. App. 104, 106, 228 S.E.2d 490, 491 (1976) ("It is presumed that no meaningless or useless words or provisions are used in a statute, but that each word or provision is to be given some effect."). Accordingly, under N.C. Gen. Stat. § 95-25.7, it is immaterial that a bonus is not "calculable" as of the date of the termination of employment if it is calculable at some later date.

Defendants point to *Moses H. Cone Mem'l Health Servs. Corp. v. Triplett,* 167 N.C. App. 267, 605 S.E.2d 492 (2004), as supporting their requirement that a bonus be "calculable" or "quantifiable." *Moses H. Cone,* however, did not address the payment of a bonus following termination of employment, but rather only whether the employer could change mid-year its formula for calculating a bonus due under a year-end bonus plan. Under either formula, the bonus was calculated based on the employee's professional productivity as determined on the last day of the 12th month of the year. Consequently, no particular amount was earned until the year was completed. *Moses H. Cone* held only that when the determination of the amount of a bonus occurred at the end of the year, then an employer could change the formula for calculating the bonus mid-year upon proper notice. The opinion used "calculable" and "quantifiable" in the same sense as *Narron* used "earned." Nothing in *Moses H. Cone* overrides the plain language of N.C. Gen. Stat. § 95-25.7—indeed, this Court could not do so.

Defendants rely on *McCullough v. Branch Banking & Trust Co.,* 136 N.C. App. 340, 524 S.E.2d 569 (2000), for the proposition that the termination of plaintiff's employment ended any obligation to pay him bonuses on unsold properties. The issue in *McCullough* was whether the trial court erred in failing to instruct the jury that the plaintiff—whose employment terminated prior to payment of a year-end bonus—was entitled to receive the bonus unless the employer notified him in writing that the bonus was forfeited if his employment terminated before the plan year expired. The plaintiff in *McCullough* admitted that the employer had not, at the start of the plan, decided what to do regarding the bonus plan in the event an employee left employment before year end. This Court, therefore, concluded that when the employer decided to have a policy of forfeiture of the bonus upon termination before the plan's year end, there was no change to the bonus plan and thus no requirement of written notice under N.C. Gen. Stat. § 95-25.13 (requiring prior notice of "changes" in promised wages).

Here, in contrast, defendants do not point to any evidence that prior to the termination of plaintiff's employment, defendants adopted a policy, written or unwritten, requiring forfeiture of a bonus for any property not sold as of the date of termination. In *McCullough*, a forfeiture policy existed, but was not disclosed to the plaintiff. While defendants, in this case, argue that there was no discussion of what would occur if plaintiff's "employment ended before the sale of a property he originated and implemented," in *McCullough*, the plaintiff admitted that there was discussion, and the employer had not, at the start of the plan, decided what to do. Finally, in *McCullough*, the terms of the bonus plan provided for calculation of the bonus based on the plaintiff's total year's performance. Here, plaintiff performed everything that was required of him as a prerequisite for the bonus: he originated and implemented the properties. Consistent with *Narron*, he had actually performed all the work required of him regarding the bonus. And, the properties had increased in value sufficient to create a profit giving rise to a bonus. Nothing in *McCullough* suggests that a bonus was not due plaintiff under N.C. Gen. Stat. § 95-25.7.

### 2. Reasonable Time for Resale Rule.

[5] Further, we do not agree with defendants' assertion that *McCullough* precludes plaintiff's argument that his bonus should be calculated for the unsold properties by determining property values based on a reasonable time for resale. There is no analysis in *McCullough* relating to that issue. While arguably the language of N.C. Gen. Stat. § 95-25.7 might suggest that no bonus was due until the property was actually sold—with the bonus being calculated based on the profit at that sale—since neither party has addressed this issue, neither do we.

Defendants, however, also argue that the "reasonable time for resale" rule cannot apply to this set of facts because the rule applies only when a contract is silent as to the date for calculating profits, and plaintiff testified that the bonus became payable upon the date of sale of the property. This rule allows a plaintiff to recover " 'profits which would have been made upon a resale of the property in the exercise of reasonable care and judgment.' " *Cook v. Lawson*, 3 N.C. App. 104, 108, 164 S.E.2d 29, 32 (1968) (quoting *Newby v. Atl. Coast Realty Co.*, 180 N.C. 51, 54, 103 S.E. 909, 910 (1920)).

Defendants rely upon *Sockwell & Assocs. v. Sykes Enters., Inc.*, 127 N.C. App. 139, 142, 487 S.E.2d 795, 797 (1997) (emphasis added),

in which this Court noted: "Our courts have held that *where no date for payment is specified in the contract*, the courts will presume a reasonable time." Our appellate courts have, however, three times applied the "reasonable time for resale" rule to contracts providing that proceeds or profits would be divided upon sale of the property. *See Newby*, 180 N.C. at 54, 103 S.E. at 910, (holding that when contract between parties provided that profits would be divided when land was ultimately sold, plaintiff was entitled to "one-half the profits which would have been made upon a resale of the property in the exercise of reasonable care and judgment"); *East Coast Dev. Corp. v. Alderman-250 Corp.*, 30 N.C. App. 598, 610, 228 S.E.2d 72, 81 (1976) (holding that reasonable time for resale rule applied when contract provided that proceeds would be equally divided upon sale of property); *Cook*, 3 N.C. App. at 108, 164 S.E.2d at 32 (holding that when parties had agreement to split profits upon resale of property, proper measure of damages was half of profits that would have been made upon resale of property in exercise of reasonable care and judgment). Defendants do not distinguish *Newby*, *East Coast*, or *Cook*; and we find them controlling. Accordingly, the trial court did not err in allowing plaintiff to proceed under the "reasonable time for resale" rule.[1]

### 3. Statute of Limitations.

**[6]** Finally, defendants argue that the trial court should have granted their motion for JNOV on the NCWHA claim because the claim is barred by the two-year statute of limitations for actions to recover unpaid wages. *See* N.C. Gen. Stat. § 95-25.22(f) (2009). Defendants contend the statute began running when defendants notified plaintiff in the 27 June 2002 memo that they would not pay him any bonuses "until Aspen sees fit & confident we are making money." We disagree.

In *Hamilton v. Memorex Telex Corp.*, 118 N.C. App. 1, 9, 454 S.E.2d 278, 282, *disc. review denied*, 340 N.C. 260, 456 S.E.2d 830, 831 (1995), this Court rejected an employer's argument that the statute of limitations on an unpaid wage claim starts running when the employer notifies its employees of its change in policy. The Court explained that " '[t]he statute begins to run on the date the promise is broken. In no event can the limitations period begin to run until the

---

1. Defendants rely upon the same argument to challenge (1) the trial court's denial of their motion to exclude evidence of the value of the properties originated and implemented by plaintiff as of the dates they could reasonably have been re-sold and (2) the jury charge and verdict issues related to the six unsold properties. Because we hold that the trial court properly applied this rule given the facts of this case, we also overrule these assignments of error.

injured party is at liberty to sue.' " *Id.* (quoting *Glover v. First Union Nat'l Bank*, 109 N.C. App. 451, 455, 428 S.E.2d 206, 208 (1993) (holding that statute of limitations did not begin running when employer amended retirement plan, but rather when employer refused to pay employee his retirement benefits). The Court reasoned that because "the plaintiffs suffered no injury until the defendant failed to pay them for the vacation days they had allegedly earned in 1988," the statute of limitations did not bar their claims. *Id.*

In this case, then, the statute of limitations did not begin running until the bonuses were payable—upon the property's resale—and defendants failed to pay them. That date was the date that defendants broke their promise to plaintiff. Although defendants point to the 27 June 2002 memo as constituting the triggering date, that memo did not unequivocally state that no bonus would be paid and, indeed, no bonus was yet due. *Hamilton*, therefore, controls. Since the earliest date that a property was sold was 11 September 2003, and plaintiff filed his claims on 14 December 2004, within two years of the triggering date, the trial court properly rejected defendants' statute of limitations defense.

II. Failure to Exclude Expert Witness.

**[7]** Defendants also contend that the trial court abused its discretion in denying their motion to exclude the testimony of plaintiff's expert witness, Bruce Tomlin. Defendants argue that Tomlin's testimony and reports, which dealt with the value of the properties originated and implemented by plaintiff, should have been excluded pursuant to Rule 37(b)(2) of the Rules of Civil Procedure because plaintiff failed to seasonably supplement his original designation of expert witnesses served on 18 November 2005 and failed to comply with the deadline for completing discovery set out in the trial court's Case Management Order.

The trial court, instead of excluding the witness, ordered plaintiff to make the witness available for a deposition on 10 days notice on a date and time of defendants' choosing, to reimburse defendants for the costs of the deposition (excluding attorneys' fees), and to pay defendants' attorneys' fees and expenses in pursuing the motion for sanctions. The trial court further provided that defendants would be allowed additional time to serve their expert witness designation and "if the Defendants, despite their best efforts, are unable to meet [plaintiff's] expert evidence in advance of the 23 April 2007 trial date, the Court will entertain a motion to continue."

KORNEGAY v. ASPEN ASSET GRP., LLC

[204 N.C. App. 213 (2010)]

" 'The choice of sanctions under Rule 37 lies within the court's discretion and will not be overturned on appeal absent a showing of abuse of that discretion.' " *Atl. Veneer Corp. v. Robbins*, 133 N.C. App. 594, 598, 516 S.E.2d 169, 172 (1999) (quoting *Vick v. Davis*, 77 N.C. App. 359, 361, 335 S.E.2d 197, 199 (1985), *aff'd per curiam*, 317 N.C. 328, 345 S.E.2d 217 (1986)). This Court will reverse a trial court's choice of sanctions only if the decision is " 'manifestly unsupported by reason.' " *Henderson v. Wachovia Bank of N.C., N.A.*, 145 N.C. App. 621, 629, 551 S.E.2d 464, 470 (quoting *Crutchfield v. Crutchfield*, 132 N.C. App. 193, 195, 511 S.E.2d 31, 34 (1999)), *disc. review denied*, 354 N.C. 572, 558 S.E.2d 869 (2001).

Defendants make no serious argument in their brief as to why the trial court's choice of the alternative sanction was an abuse of discretion. The trial court prepared a well-reasoned order of 14 pages, including detailed findings of fact and conclusions of law and a careful discussion of why the trial court had reached the decision it did. The sanction imposed is one frequently imposed under these circumstances and since defendants have failed to demonstrate why it is inappropriate, we cannot conclude that it constitutes an abuse of discretion.

III. Motion for New Trial.

[8] Defendants also contend that rather than ordering a remittitur of damages, the trial court should have granted a new trial on both liability and damages because (1) the jury's verdict reflected a compromise on liability and damages and (2) the issues of liability and damages are intertwined. In *Handex of the Carolinas, Inc. v. County of Haywood*, 168 N.C. App. 1, 20, 607 S.E.2d 25, 36-37 (2005) (internal citations omitted), this Court explained:

A new trial as to damages only should be ordered if the damage issue is separate and distinct from the other issues and the new trial can be had without danger of complication with other matters in the case. It must be clear that the error in assessing damages did not affect the entire verdict. If it appears the damages awarded were from a compromise verdict, a new trial on damages alone should not be ordered.

The resolution of this issue is dictated by the standard of review. As this Court has stressed, "a trial court can exercise its discretion by granting a partial new trial solely on the issue of damages. In such an instance, the question is not whether the appellate court would have

ruled differently, but whether the ruling constituted a manifest abuse of discretion." *Loy v. Martin*, 156 N.C. App. 622, 625, 577 S.E.2d 407, 409 (internal citation omitted), *disc. review denied*, 357 N.C. 251, 582 S.E.2d 274 (2003). The sole issue before this Court is, therefore, whether the trial court *abused its discretion* in denying a new trial on both liability and damages.

Defendants point to *Robertson v. Stanley*, 285 N.C. 561, 562-63, 206 S.E.2d 190, 192-93 (1974), in which the Supreme Court awarded a new trial on both liability and damages when the jury found that the defendant was negligent and the plaintiff was not contributorily negligent, but then awarded no damages. The Court explained:

"Where it appears that the verdict was the result of a compromise, such error taints the entire verdict and requires a new trial as to all of the issues in the case. If the award of damages to the plaintiff is 'grossly inadequate,' so as to indicate that the jury was actuated by bias or prejudice, or that the verdict was a compromise, the court must set aside the verdict in its entirety and award a new trial on all issues."

*Id.* at 569, 206 S.E.2d at 195-96 (quoting 58 Am. Jur. 2d, *New Trial* § 27 (1971)).

As this Court pointed out in *Loy*, however, *Robertson*, which involved review of the denial of a motion for a new trial, does not apply when the issue is whether the trial court abused its discretion in ordering a partial new trial limited to damages. 156 N.C. App. at 625 n.1, 577 S.E.2d at 409 n.1. In any event, in this case, we fail to see how the jury's verdict could be viewed as involving a compromise verdict. In *Robertson*, the jury's decision to award no damages was at odds with its finding that the defendant was negligent and the plaintiff was not contributorily negligent. In this case, the jury found the existence and breach of a contract. The jury was then supposed to decide plaintiff's damages under that contract: 20% of the profits on the projects plaintiff implemented and originated. Instead of using that measure of damages, the jury miscalculated and awarded an amount higher than what was due under the contract. No compromise between liability and damages appears.

With respect to their intertwining argument, defendants rely upon *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 292 N.C. 557, 234 S.E.2d 605 (1977), in which the Supreme Court held that the Court of Appeals erred in granting a partial new trial on damages only because

the issues of liability and damages were intertwined. The plaintiffs presented evidence on several different theories as to what constituted a breach of the contract, and the measure of damages could have varied according to which breach the jury found. *Id.* at 564, 234 S.E.2d at 609. Thus, a new trial on both issues was required. *Id.* at 566, 234 S.E.2d at 610.

In this case, however, plaintiff presented a single theory of breach of contract: that he was owed a bonus of 20% of the profits on properties that he originated and implemented. At trial, although defendants argued there was no contract, counsel's arguments and the evidence indicate that defendants agreed with plaintiff that if there was a contract, it was an 80/20 split of the profits, which were defined as revenues minus costs. The dispute between the parties was over what should be included within "costs."

As discussed in connection with the motion for JNOV, North Carolina courts have previously held that even if no agreement had been reached on how net income or costs would be calculated, an enforceable contract would still exist. Thus, in *Arndt*, 170 N.C. App. at 523, 613 S.E.2d at 278, the manager for a bank orally agreed with the plaintiff to pay him a bonus of 20% of all net income he earned for the bank, but the parties did not specifically agree on the formula to compute net income. Nevertheless, this Court held that the evidence of that agreement was sufficient to permit a jury to find a contract. *Id.* at 523-24, 613 S.E.2d at 279. Likewise, in *Chew*, 228 N.C. at 184, 44 S.E.2d at 871, our Supreme Court held that a contract existed based only on an agreement to pay a bonus based upon a reduction in production costs even though the agreement did not specify how production costs would be measured.

There is no question that the jury found that a contract existed, but that the verdict awarded for breach of the contract exceeded the amount supported by the evidence. While defendants have argued vigorously that the verdict suggests the jury found a different contract than that argued by the parties, we believe, given the arguments made at trial, that the trial court could have reasonably determined, as it did, that the problem with the verdict was one of calculating the damages. At a trial limited to damages, the parties would have been free to present evidence on what the profits were, including what costs should have been deducted.

In *Redevelopment Comm'n of the City of Durham v. Holman*, 30 N.C. App. 395, 397, 226 S.E.2d 848, 850, *disc. review denied*, 290 N.C.

778, 229 S.E.2d 33 (1976), this Court confirmed that "when a jury's verdict exceeds the evidence, the decision to grant a new trial is in the discretion of the trial judge, and the appellate court will review the trial judge only if it appears he grossly abused his discretion." In *Holman*, there was, as in this case, no dispute that the verdict exceeded the amount supported by the evidence. *Id.* The trial court allowed a motion for remittitur and denied a motion for a new trial. *Id.*, 226 S.E.2d at 849. In upholding that decision, this Court first noted that "while the verdict in the instant case exceeded competent evidence, the judgment [was] based on competent evidence." *Id.*, 226 S.E.2d at 850. The Court then concluded that the trial court's decision to remit the award to the highest amount supported by the evidence rather than awarding a new trial did not constitute an abuse of discretion. *Id.*

Here, the judgment is based on competent evidence, including both the jury's finding of a breach of contract and the amount of damages ultimately awarded as a result of the remittitur. We cannot find that the trial court's determination, after reviewing the verdict and considering counsel's arguments, was manifestly unreasonable. Therefore, *Holman* requires that we uphold the trial court's decision.

We also find *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 149 Ill. App. 3d 53, 501 N.E.2d 1280 (1986), *aff'd in part and rev'd in part on other grounds*, 118 Ill. 2d 306, 515 N.E.2d 61 (1987), persuasive. In *Midland*, the trial court had erred in its instruction on lost profits, and the question before the appellate courts was whether it was appropriate to order a new trial limited to damages. *Id.* at 64-65, 501 N.E.2d 1288. The court recited the following test:

> A new trial solely on the issues of damages may be granted only where (1) the jury's verdict on the question of liability is amply supported by the evidence; (2) the questions of liability and damages are so distinct that a trial limited to the question of damages is not unfair to the defendant; and (3) the damages do not appear to be the result of a compromise on the question of liability.

*Id.* at 65, 501 N.E.2d at 1288. After finding that the first and third elements were met, the trial court turned to the second element:

> The jury's response to the special interrogatory makes clear that it had definite views that defendant was liable for breach of contract, and we perceive no unfairness in limiting retrial to the issue of damages alone. The two questions are clearly distinct

in this case, as evidenced by the fact that the jury was asked to specifically consider liability in a separate interrogatory, requested by defendant, in which it did not have to address the issue of damages.

*Id.* at 65-66, 501 N.E.2d at 1288.

The same is true in this case. The jury's verdict sheet included six separate questions:

1. "Did the Plaintiff Timothy Kornegay and Defendant Aspen Asset Group, LLC enter into a contract?"

. . . .

2. "Did the Defendant Aspen Asset Group, LLC breach the contract?"

. . . .

3. "Was each of the individual Defendants an 'employer' under the North Carolina Wage and Hour Act with respect to Plaintiff Timothy Kornegay's claim for bonus compensation?"

. . . .

4. "Did the Plaintiff originate and implement the Love property?"

. . . .

5. "Could Defendants have sold certain properties for a profit in the exercise of reasonable care and judgment?"

. . . .

6. "What amount is the Plaintiff entitled to recover from Defendant Aspen Asset Group, LLC for breach of contract?"

. . . .

Thus, as in *Midland Hotel Corp.*, the issues of liability and damages were separate questions for the jury. The jury had to decide whether there was a contract and whether that contract was breached in two separate questions. Subsequently, the jury answered three separate questions relating to the calculation of damages. As in *Midland*, the jury's answers to these questions and their ultimate verdict suggests that "it had definite views" that defendants breached the contract. *Id.* We, therefore, hold that the trial court did not abuse its discretion in denying the motion for a new trial on both liability and damages.

**KORNEGAY v. ASPEN ASSET GRP., LLC**

[204 N.C. App. 213 (2010)]

Plaintiff's Cross-Appeal

I. Jurisdiction over Cross-Appeal.

**[9]** Before turning to the merits of plaintiff's cross-appeal, we must first address defendants' contention that the cross-appeal is barred by plaintiff's acceptance of the trial court's remittitur of the jury's damages award. Although the North Carolina appellate courts have not yet addressed this issue, the majority of other jurisdictions hold that a plaintiff who accepts a remittitur cannot appeal the remittitur or any issue inextricably intertwined with the remittitur. *See, e.g., Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.*, 257 F.3d 449, 460-61 (5th Cir. 2001) (holding that plaintiff could not appeal ruling on punitive damages claim because punitive damages issue was intertwined with issue of compensatory damages and plaintiff accepted remittitur of compensatory damages).

A plaintiff may, however, appeal an issue that is "separate and distinct" from those issues covered by the remittitur. *See, e.g., Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 626-27 (4th Cir.) (holding that although plaintiff was barred from appealing remittitur order by virtue of acceptance of remittitur, he could appeal other unrelated claims asserted below), *cert. denied*, 434 U.S. 923, 54 L. Ed. 2d 280, 98 S. Ct. 400 (1977).

Defendants argue that plaintiff's claims for liquidated damages and attorneys' fees under the NCWHA—the subject of his cross-appeal—are inextricably intertwined with the subject of the remittitur, the breach of contract claim. According to defendants, because the NCWHA expressly conditions recovery of liquidated damages and attorneys' fees on a plaintiff's establishing statutory liability for some amount of actual damages, the breach of contract claim and NCWHA claim are one and the same and liquidated damages and attorneys' fees are just an additional remedy.

We agree with plaintiff that the issues of liquidated damages and attorneys' fees are separate and distinct from the breach of contract issue. A claim under the NCWHA is a separate legal claim for relief with separate remedies. Liquidated damages and attorneys' fees are unavailable as a remedy for plaintiff's breach of contract claim, which was the claim addressed by the remittitur order. This appeal is, therefore, properly before us.

## II. Trial Court's Denial of Liquidated Damages and Attorneys' Fees.

Turning to the merits, plaintiff first contends the trial court erred in denying his motion for liquidated damages under the NCWHA based on its finding that defendants were acting in good faith and based on reasonable grounds. N.C. Gen. Stat. § 95-25.22(a1) provides:

> In addition to the amounts awarded pursuant to subsection (a) of this section, the court shall award liquidated damages in an amount equal to the amount found to be due as provided in subsection (a) of this section, provided that if the employer shows to the satisfaction of the court that the act or omission constituting the violation was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this Article, the court may, in its discretion, award no liquidated damages or may award any amount of liquidated damages not exceeding the amount found due as provided in subsection (a) of this section.

The employer bears the burden of avoiding liquidated damages by showing that it acted in good faith and with a reasonable belief that its actions were not in violation of the NCWHA. *Hamilton*, 118 N.C. App. at 15, 454 S.E.2d at 285. "When the employer cannot make such a showing, the trial court has no discretion and must award liquidated damages." *Id.* "[E]ven if an employer shows that it acted in good faith, and with the belief that its action did not constitute a violation of the Act, the trial court may still, in its discretion, award liquidated damages in any amount up to the amount due for unpaid wages." *Id.* We, therefore, review for abuse of discretion a trial court's ultimate decision whether to impose liquidated damages after a showing of good faith and reasonable grounds by the defendant.

### A. *Right to a Jury Trial.*

[10] As an initial matter, plaintiff argues that the issue whether defendants were acting in good faith and on reasonable grounds should have been submitted to the jury. The plain language of N.C. Gen. Stat. § 95-25.22(a1) states, however, that the employer must show "to the satisfaction of *the court*" that its actions were in good faith and based on reasonable grounds, and further provides that "*the court* may, in its discretion," choose not to award liquidated damages. (Emphasis added.) *See also Mason v. ILS Tech., LLC*, 2007 WL 1101224, *7, 2007 U.S. Dist. LEXIS 26950, *7 (W.D.N.C. April 11, 2007) (unpublished) (holding that use of phrase "the court" in § 95-25.22(a1) indicates determination of good faith is for trial judge).

In accord with this language, the North Carolina appellate courts have consistently assumed that the trial judge is the one to decide the question of good faith and reasonable grounds under the NCWHA. *See Luke v. Omega Consulting Group, LC*, 194 N.C. App. 745, 752, 670 S.E.2d 604, 610 (2009) ("The trial court is only permitted to reduce the award of liquidated damages if 'the employer had reasonable grounds for believing that the act or omission was not a violation of this Article' " (quoting N.C. Gen. Stat. § 95-25.22(a1))); *Arndt*, 170 N.C. App. at 531-32, 613 S.E.2d at 283 (holding that even though record contained evidence that employer was acting in good faith and on reasonable grounds, trial judge's decision to award liquidated damages on defendants was not manifestly unsupported by reason).

[11] Plaintiff asserts that the failure to submit the issue of defendants' good faith and reasonable grounds to the jury was a violation of his constitutional right to a jury trial in "all actions respecting property." Although this constitutional right is limited to claims that existed at the time the state constitution was adopted in 1868, if a statutory claim parallels a claim available in the common law at that time, it also carries with it a right to a jury trial. *Kiser v. Kiser*, 325 N.C. 502, 510, 385 S.E.2d 487, 491 (1989).

In *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 177-78, 594 S.E.2d 1, 13 (2004), the Supreme Court held that a plaintiff does not have a property right in punitive damages for purposes of the constitutional right to a jury trial. Similarly, this Court has held that there is no constitutional right to a jury trial on the question of Rule 11 sanctions. *See Hill v. Hill*, 181 N.C. App. 69, 73-74, 638 S.E.2d 601, 604-05, *appeal dismissed and disc. review denied*, 361 N.C. 427, 648 S.E.2d 502-03 (2007), *cert. denied*, 555 U.S. 1052, 172 L. Ed. 2d 620, 129 S. Ct. 633 (2008). We see no basis for distinguishing between punitive damages and Rule 11 sanctions, on the one hand, and liquidated damages under the NCWHA on the other. *Cf. Hamilton*, 118 N.C. App. at 16, 454 S.E.2d at 286 (holding liquidated damages are not compensatory damages).

Plaintiff relies on *Overcash v. Blue Cross & Blue Shield of N.C.*, 94 N.C. App. 602, 614-15, 381 S.E.2d 330, 338-39 (1989), in which this Court held that the right to a jury trial extends to ERISA actions brought in North Carolina courts even if a jury trial would not be granted in federal court. In *Overcash*, the Court reasoned that although it was an ERISA claim, "the right to benefits under the plan is a matter of contract and, prior to the enactment of ERISA, courts

would review the denial of benefits in the same manner as any other contract claim." *Id.* at 614, 381 S.E.2d at 338. Plaintiff contends "the cause of action under the Wage and Hour Act for unpaid wages parallels a common law contract claim." While this Court's decision in *Overcash* might be relevant to a discussion of whether there is a right to a jury trial on an employer's liability for compensatory damages under the NCWHA, as that claim parallels a breach of contract claim, here we are concerned with plaintiff's claim for *liquidated damages*, a claim more analogous to punitive damages as to which no jury trial attaches. The liquidated damages issue was, therefore, properly decided by the trial court.

B. *Waiver.*

[12] Plaintiff also argues that the trial court should have awarded liquidated damages because defendants waived the good faith and reasonable grounds defense by failing to plead it or request its submission to the jury. We need not address the issue of waiver, however, because we have concluded, based on the record, that plaintiff impliedly consented to trial of the issue. *See N.C. State Bar v. Gilbert,* 189 N.C. App. 320, 324, 663 S.E.2d 1, 4 ("Under the doctrine of implied consent, plaintiff's failure to plead an affirmative defense does not result in waiver where some evidence is introduced at trial pertinent to the elements of the affirmative defense."), *disc. review denied,* 362 N.C. 682, 670 S.E.2d 234 (2008).

C. *Sufficiency of Trial Court's Order.*

[13] Plaintiff next challenges the merits of the trial court's decision not to award liquidated damages. In declining to impose liquidated damages, the trial court made the following findings:

5. On the issue of liquidated damages, the Court finds, by the greater weight of the evidence, that Defendants acted in good faith in discharging their obligations under the Wage and Hour Act and had a reasonable basis for believing that their failure and refusal to pay bonuses to Plaintiff was not in violation of the Act.

6. The facts of this case were unusual to say the least. The jury was required to sort through substantial disputes as to, among other things, (1) the very existence of an agreement between the parties to pay bonuses; (2) the scope of any such bonus agreement; (3) the dates when bonus payments accrued; and (4) the costs to be offset against any bonus payments. As a

result, the Court finds specifically that Defendants had reasonable grounds for defending against Plaintiff's claims and acted in good faith with respect to their obligations under the Act.

7. The Court also declines to exercise its discretion under the Act to award liquidated damages.

The North Carolina appellate courts have yet to address the proper standard of review for a trial court's underlying determinations of good faith and reasonableness under the NCWHA. Several appellate courts have, however, discussed the standard of review with respect to nearly identical language in the Fair Labor Standards Act ("FLSA").[2] In *Laborers' Int'l Union of N. Am., AFL-CIO v. Case Farms, Inc.*, 127 N.C. App. 312, 314, 488 S.E.2d 632, 634 (1997), this Court noted that "[t]he North Carolina Wage and Hour Act is modeled after the Fair Labor Standards Act (FLSA)" and explained that opinions construing the FLSA are, therefore, helpful in interpreting the NCWHA.

In *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908 (3d Cir. 1991) (internal citation omitted), *cert. denied*, 503 U.S. 936, 117 L. Ed. 2d 617, 112 S. Ct. 1473 (1992), the Third Circuit held:

Assuming a district court has first properly made the required preliminary findings of an employer's subjective good faith and objectively reasonable grounds for violating the Act, we will review its exercise of "substantial discretion" to deny or limit an award of liquidated damages only for abuse of discretion. Furthermore, while we must apply the clearly erroneous standard of Fed.R.Civ.P. 52(a) when reviewing both the district court's historical findings of fact which underlie its "good faith" and "reasonableness" determinations, and the finding of subjective good faith itself, we exercise plenary review of the district court's legal conclusion that Cooper had "reasonable grounds for believing" that its violative conduct was not a violation of the FLSA.

*See also Air Logistics of Alaska, Inc. v. Throop*, 181 P.3d 1084, 1097 (Alaska 2008) ("The question of whether an employer has shown good faith and reasonableness by clear and convincing evidence is a mixed question of law and fact. Therefore, factual findings will be

---

2. 29 U.S.C. § 260 provides that in any action to recover unpaid wages under the FLSA, the trial court may, in its discretion, decline to impose liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation" of the Act.

overturned only if they are clearly erroneous, but an application of the law to established facts will be reviewed de novo. Once it is established that the superior court did not err in finding clear and convincing evidence of good faith and reasonableness, the superior court's decision regarding whether or not to award any level of liquidated damages is reviewed for abuse of discretion."); *Tefft v. State*, 271 Mont. 82, 91-92, 894 P.2d 317, 323 (1995) ("What constitutes good faith and reasonable grounds, as those notions relate to the issue of liquidated damages, involves mixed questions of law and fact. To the extent that legal principles are involved, the standard of review is de novo, but to the extent that factual issues are involved, we will reverse the district court only for clear error.").

In essence, these courts have held that the traditional standard of review that applies to a trial court's factual findings—in federal court, the "clearly erroneous" standard and in North Carolina, the "competent evidence" standard—applies to findings of fact made by a trial court in addressing a claim for liquidated damages. In reviewing the trial court's conclusions of law, the courts have held that review is de novo, including on the issue whether the findings of fact support the conclusions of law.

We note that this standard of review is identical to the standard of review used by the North Carolina appellate courts in reviewing orders imposing Rule 11 sanctions, which also involve a mixture of issues of fact and issues of law. *See Turner v. Duke Univ.*, 325 N.C. 152, 165, 381 S.E.2d 706, 714 (1989) (in reviewing trial court's decision to impose Rule 11 sanctions, "the appellate court will determine (1) whether the trial court's conclusions of law support its judgment or determination, (2) whether the trial court's conclusions of law are supported by its findings of fact, and (3) whether the findings of fact are supported by a sufficiency of the evidence"). We, therefore, adopt and apply the standard of review applied by the above courts when considering the FLSA.

In contrast to many NCWHA cases, this case does not involve an employer's general policy or plan, but rather hinges entirely on the legal effect of initial negotiations between plaintiff and Steve Clardy. If there were no enforceable contract regarding payment of a bonus, then defendants would have no obligations under the NCWHA with respect to a bonus. As the trial court found, evidence was presented by both sides regarding whether any contract existed at all as to bonuses, what properties could give rise to a bonus, the precise means of calculating the bonuses, and when the bonuses were due to

be paid. Even though the jury ultimately did not agree that no contract existed, the record contains sufficient evidence that defendants genuinely believed that there was no contract to support the trial court's finding that defendants were acting in good faith. Plaintiff, of course, presented evidence countering that showing, but, under the applicable standard of review, we must uphold the trial court's finding of good faith.

Plaintiff urges that there can be no finding of good faith because defendants presented no evidence that they ever considered the requirements of the NCWHA or that they attempted to ascertain their obligations under the Act. The evidence presented by defendants at trial, however, was that defendants believed there was no agreement at all to pay plaintiff 20% of the profits. Therefore, they would have no reason to investigate the requirements of the NCWHA. The trial court's finding of good faith is, therefore, supported by competent evidence and is binding on appeal.

With respect to whether defendants had a reasonable basis for believing their failure to pay bonuses to plaintiff was not in violation of the NCWHA, we adopt the rule applied in the majority of jurisdictions with respect to the FLSA and use an objective standard. *See, e.g., Chao v. Barbeque Ventures, LLC,* 547 F.3d 938, 942 (8th Cir. 2008) (" 'To avoid a liquidated damages award . . . the employer must also prove its position was objectively reasonable.' " (quoting *Hultgren v. County of Lancaster,* 913 F.2d 498, 509 (8th Cir. 1990))); *Alvarez v. IBP, Inc.,* 339 F.3d 894, 910 (9th Cir. 2003) ("To satisfy § 260, a FLSA-liable employer bears the 'difficult' burden of proving both subjective good faith and objective reasonableness, 'with double damages being the norm and single damages the exception.' " (quoting *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 142 (2d Cir. 1999))), *aff'd,* 546 U.S. 21, 163 L. Ed. 2d 288, 126 S. Ct. 514 (2005).

We agree with the trial court that, given the evidence at trial, a reasonable employer could have believed that no contract regarding payment of a bonus arose and, therefore, defendants were not obligated under the NCWHA to pay plaintiff a bonus. Plaintiff's arguments require that we adopt his construction of the evidence—in essence, he argues that he was entitled to a directed verdict or JNOV as to the existence of a contract. The trial court, however, denied plaintiff's directed verdict and JNOV motions, and plaintiff has not sought review of those decisions. We see no basis for concluding on appeal, solely for purposes of the liquidated damages issue, that the evidence

**KORNEGAY v. ASPEN ASSET GRP., LLC**

[204 N.C. App. 213 (2010)]

was undisputed that the parties entered into an enforceable contract for the payment of bonuses.

**[14]** Finally, plaintiff contends that the trial court's findings of fact are not sufficiently specific. In order to ensure meaningful review on appeal, "[t]he trial court must . . . make sufficient findings of fact and conclusions of law to allow the reviewing court to determine whether a judgment, and the legal conclusions that underlie it, represent a correct application of the law." *Spicer v. Spicer*, 168 N.C. App. 283, 287, 607 S.E.2d 678, 682 (2005). Although the findings of fact could have been more precise, we hold that they were adequate to set out the factual basis for the trial court's conclusions and to explain its rationale for deciding not to exercise its discretion to award liquidated damages. As plaintiff makes no serious argument as to how the trial court's ultimate decision not to impose liquidated damages was an abuse of discretion, we affirm the liquidated damages decision.

D. *Attorneys' Fees.*

**[15]** Plaintiff also challenges the trial court's denial of his motion for attorneys' fees. A trial court's decision whether or not to award attorneys' fees under N.C. Gen. Stat. § 95-25.22(d) is reviewed for abuse of discretion. *See Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 358, 416 S.E.2d 166, 172 (1992) ("Plaintiffs, in the discretion of the court, also could have recovered reasonable attorneys' fees [under the NCWHA]."); *Fulk v. Piedmont Music Ctr.*, 138 N.C. App. 425, 435, 531 S.E.2d 476, 482 (2000) ("Thus where, as here the [NCWHA] applies, the court in its discretion may award plaintiff attorney's fees.").

Although plaintiff argues that the trial court failed to make adequate findings of fact to support its denial of his motion for attorneys' fees, our review of the order leads us to conclude that the findings of fact relied upon in denying the request for liquidated damages also were the basis for the denial of attorneys' fees. We do not believe that the trial court's denial of attorneys' fees because of the substantial dispute in the evidence was manifestly unreasonable. Accordingly, we also affirm the denial of attorneys' fees.

No error.

Judges ROBERT C. HUNTER and STEELMAN concur.