GR&S Atlantic Beach, LLC v. Hull, 2012 NCBC 52.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
11 CVS 5883

GR&S ATLANTIC BEACH, LLC and
GR&S ATLANTIC BEACH HOTEL,
LLC,

        Plaintiffs,

        v.

H. WILLIAM HULL and MARILYN
H. HULL,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER**

{1}    THIS MATTER is before the court on cross-motions for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons stated below, Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") is GRANTED IN PART and RESERVED IN PART, and Defendants' Motion for Summary Judgment ("Defendants' Motion") is DENIED IN PART and RESERVED IN PART.

> *Poyner Spruill LLP, by Steven B. Epstein and Christopher J. Ayers for Plaintiffs GR&S Atlantic Beach, LLC and GR&S Atlantic Beach Hotel, LLC.*

> *Troutman Sanders, LLP, by Gary S. Parsons, Whitney S. Waldenberg, and Jennifer M. Hall for Defendants H. William Hull and Marilyn H. Hull.*

Gale, Judge.

## I. THE PARTIES

{2}    Plaintiff GR&S Atlantic Beach, LLC ("GR&S") is a Delaware limited liability company created in 2003 for the purpose of acquiring the Sheraton Atlantic Beach Oceanfront Hotel ("Hotel") from Atlantic Beach Hotel Limited Partnership ("ABHLP").

{3} Plaintiff GR&S Atlantic Beach Hotel, LLC ("GR&S Hotel") is a Delaware limited liability company formed on May 7, 2011, as part of the transaction refinancing GR&S's debt secured by the Hotel ("Refinancing").

{4} Defendants H. William Hull ("Mr. Hull") and Marilyn H. Hull ("Mrs. Hull") are citizens of Raleigh, Wake County, North Carolina. Mr. Hull is the principal owner of ABHLP.

## II. PROCEDURAL HISTORY

{5} On February 19, 2008, GR&S sued the Hulls and others in Carteret County Superior Court ("Carteret County Action"), asserting claims pursuant to a February 20, 2004 Indemnity Agreement entered into between the parties as a part of GR&S' purchase of the Hotel from ABHLP (the "Indemnity Agreement"). GR&S Hotel had then not been formed and was not a party to the Carteret County Action. GR&S dismissed the Carteret County Action without prejudice during trial on January 27, 2011.

{6} On April 15, 2011, GR&S and GR&S Hotel brought this current lawsuit in Wake County Superior Court asserting claims under the Indemnity Agreement. The case was designated as a complex business case on May 16, 2011 and assigned to the undersigned on May 18, 2011.

{7} On July 15, 2011, Defendants filed a Motion to Dismiss, alternatively seeking to eliminate or cap any claim for attorneys' fees. Although the Indemnity Agreement specifically provided for recovery of attorneys' fees, Defendants contend that the agreement must be but is not further supported by statutory authority; and alternatively, if the Indemnity Agreement constitutes an "evidence of indebtedness" within the meaning of N.C. Gen. Stat. § 6-21.2 ("Section 6-21.2"), the statute requires that fees must be capped at fifteen percent of the total indebtedness.

{8} On September 29, 2011, the court denied the Motion to Dismiss by an Order intended to provide guidance as to the court's likely ultimate determination as to whether "Ancillary Fees," meaning attorneys' fees incurred in litigation with third parties, may be recovered based on the Indemnity Agreement without further

express statutory support, whereas recovery of "Direct Fees" clearly requires such statutory authority. The court reserved further consideration of the issue based on intervening statutory or appellate guidance.

{9} Following the close of discovery, Defendants filed their Motion for Summary Judgment on April 13, 2012. Plaintiffs filed their Motion for Summary Judgment on May 14, 2012.

{10} Between these filings, on April 25, 2012, the presiding Superior Court Judge entered a Consent Order for Appointment of Receiver in the action pending in Carteret County Superior Court, styled *In the Matter of the Proposed Foreclosure of the Deed of Trust executed by GR&S ATLANTIC BEACH HOTEL LLC, etc.,* 12-SP-153, Carteret County Superior Court ("the Receivership Order"). The Receiver has made no appearance in the instant action, and the court has not been otherwise advised of any position the Receiver has expressed or taken concerning claims Plaintiffs bring in this action.

{11} Defendants' Motion presented two primary arguments: (1) that all claims are barred by a single limitations period which has expired; and (2) that any claim for attorneys' fees should be excluded or capped for the reasons stated in the earlier Motion to Dismiss. After filing their Motion, Defendants contended that the Receivership Order vests in the Receiver the exclusive right to pursue claims pending in this action, so that this action should be dismissed.

{12} Plaintiffs' Motion seeks the summary adjudication that the Indemnity Agreement obligates Defendants to indemnify Plaintiffs for each of their claims, and Defendants, having failed to honor their obligations, are liable to Plaintiffs, so that at trial Plaintiffs need prove only damages without further proof of liability.

{13} The Motions have been fully briefed, argued, and are ripe for disposition.

## III.  FACTUAL BACKGROUND

{14}     The following facts are stated for context, and except where noted, the court believes they are uncontested.  *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 215 S.E.2d 162 (1975).

A.  <u>The Sale and the Indemnity Agreement</u>

{15}     The Hotel is adjacent to the Island Beach and Racquet Club Condominiums ("IBRC").  Both the Hotel and IBRC obtain sewage treatment services from a nearby treatment facility ("Treatment Facility").  Prior to the sale of the Hotel to GR&S, the North Carolina Department of Environment and Natural Resources ("NCDENR") determined that the Treatment Facility did not comply with legal requirements.  On June 22, 2000, NCDENR put the Treatment Facility under a Special Order by Consent ("SOC") requiring remedial efforts.  (William Hull Dep. 50 Ex. 5.)

{16}     Through its Section 3 and Section 4, the Indemnity Agreement set a budget for the remedial efforts known to be necessary at the time of the Hotel sale and allocated responsibility for that budget.  However, the Indemnity Agreement included additional provisions.

{17}     Section 1 of the Indemnity Agreement provides that GR&S or its assigns ("Indemnitees") will be held:

> harmless from and against any and all liabilities (including strict liability), claims, actions, causes of action, damages, judgments, liens, losses, injuries, costs and expenses (including reasonable attorneys' fees and specifically including, without limitation of the foregoing, attorneys' fees incurred to enforce the terms of this Agreement) of any and every kind whatsoever paid, incurred or suffered by, or asserted against, the Indemnitees with respect to, or as a result of or resulting from, or arising from or in any way relating to, directly or indirectly, the Treatment Facility, the ownership, use and/or operation thereof[.]

{18}     Following this general undertaking, Section 1 sets out several subsections defining specific types of indemnified losses.  Subsections A through F detail various costs or losses that may arise from use or operation

of the Treatment Facility.  Subsection G addresses costs and expenses associated with enforcing Defendants' obligations under Sections 3 and 4.

{19}     Section 3 of the Indemnity Agreement defines "Work" necessary to bring the Treatment Facility into regulatory compliance.  The Parties have later referred to these efforts as "Legacy Repairs."  Section 4 required GR&S to contribute to the costs of the Work, but that it would "have no obligation to pay any costs or expenses incurred in connection with the Work to the extent [it] exceeds the Budget Amount."  The Hulls agreed "to pay (and/or reimburse [Indemnitees]) when due any and all costs and/or expenses incurred in connection with the Work to the extent the aggregate amount of such costs and expenses exceed the Budget Amount."

{20}     The Budget Amount was defined as $400,000.00 less amounts paid by IBRC.  In April 2004, GR&S and IBRC entered into an agreement, providing for IBRC's contribution to the remedial efforts.  (Aff. of Daniel C. Higgins ¶¶ 20–25, Ex. 3.)

{21}     Section 5 of the Indemnity Agreement separately provides that Indemnitees may sue and recover if the Indemnitors fail to pay or defend a "Claim," (defined by Section 1) or fail to pay obligations under Section 3.

{22}     The Agreement allows for Indemnitees to recover their "entire cost . . . including, without limitation, reasonable attorneys' fees[.]"


B.  Tank Collapse Claims

{23}     On August 3, 2005, one of the Treatment Facility's two tanks collapsed, leading to a release onto surrounding properties (the "Tank Collapse").

{24}     On November 8, 2005, counsel for GR&S demanded that Defendants assume liability for the costs and expenses that Plaintiffs expected to arise from the Tank Collapse.  On November 10, 2005, counsel for Mr. Hull responded that Mr. Hull stood ready to pay costs relating to the

Tank Collapse in the event that they exceeded the Budget Amount.  (Hull Dep. 161–64, Exs. 18, 19.)

{25}    Enviracon Utilities, Inc. ("Enviracon") incurred substantial costs as operator of the Treatment Facility as a result of the Tank Collapse.  On April 7, 2006, the North Carolina Utilities Commission ("NCUC") ruled that Enviracon was insolvent and that it would allow Enviracon to abandon its operation of the Treatment Facility, unless GR&S and IBRC funded an escrow account to pay for the necessary cleanup and repair costs.  (Aff. of Daniel C. Higgins¶ 36–37, Ex. 7.)  On May 31, 2006, NCUC imposed temporary emergency utility rates on GR&S and IBRC for Tank Collapse-related cleanup costs which were in addition to the regular monthly rates based on normal operations.  (Aff. of Daniel C. Higgins.¶ 39-41, Ex. 9.)  On March 21, 2007, NCUC imposed an additional temporary rate. (Aff. of Daniel C. Higgins ¶ 42.)  NCUC imposed an additional temporary rate increase on April 5, 2007.  (Aff. of Daniel C. Higgins ¶ 32.)

{26}    A portion of the emergency rates were designated for contribution to a fund for the settlement of claims made against Enviracon by mobile home owners from the nearby trailer park ("Mobile Home Park Claims").  (Aff. of Daniel C. Higgins ¶ 44.)  On April 10, 2008, NCUC ordered GR&S to make additional payments necessary to resolve the Mobile Home Park Claims.  (Aff. of Daniel C. Higgins ¶ 46, 47, Ex. 12.)

{27}    The court labels the various expenditures described in paragraphs 25 and 26, as well as attorneys' fees incurred in connection with the various proceedings, as "Tank Collapse Claims."

C.  The General Assignment from GR&S to GR&S Hotel

{28}    In May 2007, GR&S refinanced its debt, with GR&S Hotel formed as a part of the transaction.  On May 11, 2007, GR&S assigned assets, including the Hotel and the Indemnity Agreement, to GR&S Hotel by a document entitled "General Assignment of Bookings, Deposits, Hotel, Contract, Permits, Documents,

Accounts Receivable and Miscellaneous Assets" ("General Assignment"). (Aff. of H. William Hull, Ex. E Apr. 13, 2012.)

{29} Relevant to the present action, the General Assignment assigned "(iii) those service contracts, maintenance contracts . . . and all other contracts or agreements . . . with respect to the ownership, maintenance, operation, provisioning, or equipping of the Hotel," and "(viii) all contract rights, leases, concessions, trademarks, logos, tradenames . . . used in connection with the operation of the Property." However, the General Assignment included an exclusion of "refunds, rebates, or other claims, or interest thereon, for period or events occurring prior to the date hereof."

{30} The Parties disagree whether this language is a general exclusion or a specific exclusion only for those items assigned pursuant to provision (viii). More specifically, the Parties disagree whether the Tank Collapse Claims were assigned or were excluded as claims for periods or events preceding the date of the General Assignment. This disagreement in turn leads to the dispute whether GR&S was a real party in interest for those claims when filing the Carteret County Action, thereby tolling the running of the period of limitations.

D. <u>IBRC Litigation Claims</u>

{31} On November 30, 2005, IBRC brought suit against GR&S and ABHLP in Carteret County Superior Court (the "IBRC Litigation") seeking the recovery of amounts IBRC had incurred in connection with the Tank Collapse. The IBRC Litigation was settled on April 13, 2011 with a payment of $150,000.00, which Plaintiffs allege was paid by GR&S Hotel, but which Defendants indicate may be reflected in journals as having been paid by GR&S (the "IBRC Settlement Contribution").

{32} The court refers to the IBRC Settlement Contribution, costs, and attorneys' fees incurred in connection with the IBRC Litigation as "IBRC Litigation Claims."

E.  Legacy Repairs Claims

{33}    GR&S diverted funds which had been set aside for Legacy Repairs to tank replacement costs and emergency cleanup efforts necessary to resume operations, with the result that the Legacy Repairs were delayed until 2009.  (Pls.' Mem. of Law in Supp. of Mot. for Summ. J. 6–7.)  Plaintiffs allege that the total amount paid for the Legacy Repairs by GR&S and/or GR&S Hotel equaled $1,106,923.00, and that the first payment in excess of the Budget Amount was a $100,000.00 payment on May 15, 2008.  (Pls.' Mem. of Law in Supp. of Mot. for Summ. J. 7.)  Defendants note that the first payment itemized by Plaintiffs as part of its payment for Legacy Repairs was on September 3, 2004 when GR&S paid a legal invoice.

{34}    The court refers to any claims based on the Work in excess of the Budget Amount as "Legacy Repairs Claims."

## IV.  STANDARD OF REVIEW

{35}    A party is entitled to summary judgment if the record shows that "there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law."  N.C. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, which may be met by proving that an essential element of the opposing party's claim is nonexistent.  *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002).  When the movant makes such a showing, the burden shifts to the nonmovant to present specific facts establishing the presence of a genuine factual dispute for trial.  *Lowe v. Bradford*, 305 N.C. 366, 369–70, 289 S.E.2d 363, 366 (1982).

## V.  ANALYSIS

{36}    Defendants' Motion and its reference to the later Receivership Order raises four primary issues: (1) whether the Receivership Order divests Plaintiffs of the right to pursue the instant action; (2) whether the Indemnity Agreement

provides a basis for each of the three categories of claims Plaintiffs make or whether instead it must be restricted to the Legacy Repairs Claims; (3) whether the claims are barred, in whole or part, by the applicable statute of limitations; and (4) whether Plaintiffs' claims may include any attorneys' fees, and if so, whether these fees must be capped.

{37}    Plaintiffs' Motion seeks the summary adjudication that Defendants are obligated to indemnify Plaintiffs for each of the three categories of claims and that Defendants have failed in each of these obligations.  Plaintiffs do not seek by this motion to determine the amount they are entitled to recover, acknowledging that the issue of damages must be reserved for trial.

A.  The Impact of the Receivership Order on Plaintiffs' Ability to Proceed

{38}    The court concludes that while the Receivership Order vested the Receiver with certain powers, the Receiver must affirmatively take steps to exercise those powers before Plaintiffs would be divested of their right to pursue claims in this action.

{39}    The Receivership Order generally recites that the Receiver is

> to take charge of, manage, preserve, protect and operate, and to sell the Property or extinguish any and all liens on the property . . . in all respects, and to otherwise preserve the Property and the security set forth in the Loan Documents and take all steps to avoid any waste, deterioration or reduction in the value of the Property until a foreclosure or sale by Receiver may be had or until further Order of this Court.

(Aff. of H. William Hull Ex. 1, at 6, June 13, 2012.)

{40}    The "Property" defined in and governed by the Receivership Order is "the Sheraton Atlantic Beach Hotel, located at 2717 West Fort Macon Road, Atlantic Beach, North Carolina 28512, and all personal property owned by [GR&S Hotel] used at or in connection therewith." Receivership Order ¶ 3.  It is unclear whether the Tank Collapse Claims would fall within this definition if they are owned by GR&S rather than GR&S Hotel.

{41}    The specific "powers and instructions" granted to the Receiver by the Receivership Order include:

> (a) to take possession and control of the Property, including all funds of the Borrower or the managing agent or other agent acting on their behalf, which funds represent a collection of the past rents, additional rents, earnings, revenues, profits, fees, deposits, insurance proceeds, bank and other financial accounts, *or similar funds or payments* collected from the Property or made for the benefit of the Property or *which are due and owing to Borrower*, or managing agent relating to the Property wherever located;
>
> (b) to collect the past and future rents, additional rents, fees or revenues from leasing and *other funds or revenues for the Property* in order to preserve the Property until further Order of this Court or a foreclosure sale or sale by Receiver may be had;
>
> ....
> (e) to succeed to any permits, leases, *contracts*, licenses, including but not limited to all business licenses that are presently held by the Borrower with respect to the Property, and agreements and enter into, modify or terminate any other permits, leases, contracts, licenses or agreements for the benefit of the Property;
>
> ....
> (l)  *to institute and prosecute suits*, including proceedings in bankruptcy court, *for the collection of rents and other charges now due or hereafter to become due or fixed* . . .

Receivership Order ¶¶ 7–10 (emphasis added).

{42}    The court concludes that the Receivership Order vests in the Receiver the option, but not the obligation to institute or prosecute litigation or to seek to assume control over this pending litigation.  Until such action is taken, GR&S Hotel remains a real party in interest to prosecute its claims in this action.

{43}    The court expresses no further opinion as to whether the Receiver would be entitled upon request to assume control of the claims in this case and to whom such request must be directed.

B. Whether the Scope of the Indemnity Agreement Extends to Tank Collapse and IBRC Litigation Claims

{44}    The Motions require the court to determine whether the scope and reach of the Indemnity Agreement may be determined as a matter of law or whether a jury must determine contested issues of material fact. That, in turn, depends upon whether the contract language is ambiguous, allowing the consideration of parol evidence. The court concludes that the contract language is clear, parol evidence is not properly considered to interpret the contract language, and trial is not necessary to interpret the scope of the Indemnity Agreement.

{45}    Plaintiffs contend that Section 1 of the Indemnity Agreement is a separate and independent undertaking from the allocation of responsibility for the known environmental Legacy Repairs contemplated in Sections 3 and 4. Defendants contend that while the Indemnity Agreement contains some broad "boilerplate" language, the clear purpose of the Indemnity Agreement was solely to address known environmental issues and not future unknown events, and that the agreement should not be more broadly interpreted.

{46}    When interpreting any contract, "[t]he court's principle objective is to determine the intent of the parties to the agreement." *Holshouser v. Shaner Hotel Grp. Props. One Ltd. P'ship*, 134 N.C. App. 391, 397, 518 S.E.2d 17, 23 (1999). In interpreting indemnity agreements, ordinary rules of construction apply. *Dixie Container Corp. of North Carolina v. W.E. Dale*, 273 N.C. 624, 627, 160 S.E.2d 708, 711 (1968). The court must attempt, if possible, to ascertain the parties' intent from the Indemnity Agreement's "four corners" without resort to parol evidence. *Lexington Furniture Indus. v. Bob Timberlake Collection, Inc.*, 2009 NCBC 22, ¶ 28 (N.C. Bus. Ct. Sept. 9, 2009).

{47}    Parol evidence may be introduced to interpret the contract only when its language is subject to more than one interpretation or its construction results in an ambiguity. *Root v. Allstate Ins. Co.*, 272 N.C. 580, 587–88, 158 S.E.2d 829, 835 (1968). In contrast, where the agreement is expressed in clear and unambiguous language, parol evidence may not be used to create an ambiguity that the language

does not afford.  "Generally, the parol evidence rule prohibits the admission of evidence to contradict or add to the terms of a clear and unambiguous contract." *Thompson v. First Citizens Bank & Trust Co.*, 151 N.C. App. 704, 709, 567 S.E.2d 184, 188 (2002) (citing *Hansen v. DHL Labs.*, 316 S.C. Ct. App. 505, 508, 450 S.E.2d 624, 626 (1994), *aff'd* 319 S.C. 79, 459 S.E.2d 850 (1995)).  If the agreement as expressed is clear and unambiguous, the court must "interpret the contract as written, and cannot, under the guise of construction, 'reject what the parties inserted or insert what the parties elected to omit.'" *Corbin v. Langdon*, 23 N.C. App. 21, 25, 208 S.E.2d 251, 254 (1974) (emphasis added) (internal citation omitted).

{48}    Although admitting that the Indemnity Agreement includes "boilerplate" language, (Pls.' Mem. of Law in Supp. of Mot. for Summ. J. 12.) Mr. Hull also contends that the specific and exclusive focus of the negotiations between the Parties was to provide for known issues related to bringing the Tank Facility into compliance with NCDENR requirements, so that the broader language of Section 1 should not expand the scope of the undertakings of Sections 3 and 4. (Defs.' Resp. in Opp'n to Pls.' Mot. for Summ. J. 11.)

{49}    The court finds that the language of the Indemnity Agreement is not ambiguous and that the clear contractual language reflects separate undertakings in Section 1 on the one hand, and in Sections 3 and 4 on the other hand.  Because there is no ambiguity, parol evidence should not be considered to narrow the clear reach of Section 1 of the Indemnity Agreement, which by its express language reaches the Tank Collapse Claims and the IBRC Litigation Claims.  Each of those claims arose from the ownership, use or operation of the Treatment Facility, and are among the Section 1 indemnities from "any and all liabilities (including strict liability), claims, actions, causes of action, damages, judgments, liens, losses, injuries, costs and expenses (including reasonable attorneys' fees and specifically including, without limitation of the foregoing, attorneys' fees incurred to enforce the terms of this Agreement)[.]"  In contrast, the separate specific provisions of Sections 3 and 4 relate to the Work and Budget Amount necessary to address known issues

associated with NCDENR-mandated remediation.  The fact that there were separate undertakings is further exemplified by the fact that Section 5 of the Indemnity Agreement separately speaks to actions brought to enforce indemnities under Section 1 and those brought pursuant to Sections 3 and 4.

{50}    Defendants additionally contend that Section 1 is ambiguous because of language in its last section which reads:

> Notwithstanding anything in this Agreement to the contrary, Indemnitors [sic] liability and obligations pursuant to this Agreement shall not extend or apply to any Claims arising out of or caused by or resulting from the negligence, in whole or in part, of any of the Indemnitors or their employees or agents.

 (Am. Compl. Ex. A, at 1.)  Defendants urge that language excepting Indemnitors' own negligence is inconsistent with the broad construction Plaintiffs offer for the Section 1 undertakings.

{51}    Assuming *arguendo* that this language creates an ambiguity, Plaintiffs' claims in this action do not invoke or depend on this provision of Section 1.  The court does not believe a potential ambiguity as to whether the Parties intended to except Indemnitees' negligence, but mistakenly chose language exempting Indemnitors' negligence, necessitates or legitimates considering parol evidence to interpret the clear language of the provisions of the Indemnity Agreement upon which Plaintiffs rely.

{52}    The court has carefully considered Defendants' contention that the Indemnity Agreement should not reach the Tank Collapse Claims or IBRC Litigation Claims because the Tank Collapse "was so totally unforeseeable that inspection by the State on the day of the collapse revealed no evidence that a collapse was imminent or even possible." (Defs.' Resp. in Opp'n to Pls.' Mot. for Summ. J. 11.) (emphasis in original).  Plaintiffs counter that the Parties need not have contemplated the specific event so long as the Parties intended to allocate responsibility for future events, either known or unknown.

{53}    Defendants point to the legal principle that indemnity agreements "cannot be extended to cover any losses which are neither expressly within its terms nor of such character that it can reasonably be inferred that they were intended to be within the contract." *Dixie Container*, 273 N.C. at 627, 160 S.E.2d at 711. (internal quotations omitted).  The difficulty Defendants have in relying on this holding is that the clear express language of Section 1 includes a broad reach that demonstrates the intent that future claims arising from the use or operation of the Treatment Facility "were intended to be within the contract."  Parol evidence is not appropriately considered to narrow the scope of the chosen language.  *Mayo v. N.C. State Univ.*, 168 N.C. App. 503, 509, 608 S.E.2d 116, 121 (2005).

{54}    Finally, Defendants contend that even if claims arising from the Tank Collapse fall within the provisions of the Indemnity Agreement, the claims must be limited to amounts occasioned by Plaintiffs' derivative liability to third parties, and that Plaintiffs cannot recover their own costs and expenses directly incurred as a cost of doing business.  Defendants again rely on *Dixie Container*, which states that "[i]n indemnity contracts the engagement is to make good and save another harmless from loss on some obligation which he has incurred or is about to incur to a third party."  273 N.C. at 628, 160 S.E.2d at 711 (quoting *New Amsterdam Casualty Co. v. Waller*, 233 N.C. 536, 537, 64 S.E.2d 826, 827 (1951)).

{55}    The primary focus of Defendants' argument is that Plaintiffs should not be allowed to recover utility rates imposed by the NCUC.   However, while paid directly as a monthly utility rate payment, the emergency rates imposed over and beyond normal rates were to absorb Enviracon's costs beyond normal operations, including its liabilities to adjacent mobile home owners.  The emergency rates, in contrast to normal rates, were in the nature of obligations occasioned by liability to third parties and properly recoverable pursuant to the indemnity provisions of the Indemnity Agreement.

{56}    In any event, indemnity contracts are not necessarily limited only to derivative liability; the scope of such agreements is controlled by the intent of the parties as evidenced by the agreement.  *Kirkpatrick & Assoc., Inc. v. Wickes Corp.*,

53 N.C. App. 306, 308, 280 S.E.2d 632, 634 (1981).  Section 1 of the Indemnity Agreement provides that Indemnitees are to be held harmless from "losses, injuries, costs and expenses . . . *of any and every kind whatsoever*[.]" (emphasis added).  This language is not limited to derivative liability to third parties.

{57}    In sum, the court concludes that Plaintiffs are entitled to pursue their Tank Collapse Claims and their IBRC Litigation Claims pursuant to Section 1 of the Indemnity Agreement, as well as their Legacy Repairs Claims pursuant to Sections 3 and 4 of the Indemnity Agreement, to the extent that such claims survive the statute of limitations, and subject to proof at trial that the expenses claimed were actually and reasonably incurred by the respective Plaintiff seeking indemnity.[1]

C. <u>The Separate Categories of Plaintiffs' Claims Are Each Governed by a Separate Limitation Period</u>

{58}    The Parties agree that all of Plaintiffs' claims are governed by the three-year limitations period for contract actions provided by N.C. Gen. Stat. § 1-52(1).  They disagree on how the statute should be applied.  Defendants contend that all categories of claims are governed by a single limitations period that began with Plaintiffs' first payment of an indemnifiable expense in September 2004.  If Defendants are correct, the limitation period ran and all claims under the Indemnity Agreement were barred even before GR&S filed the initial Carteret County Action.  Plaintiffs contend that a new limitations period began each time

---

[1]  The parties dispute whether GR&S Hotel, rather than GR&S, paid claims after the General Assignment, with the result that they cannot be recovered because GR&S paid them when it was no longer the real party in interest.  Further, Defendants contend that parts of the affidavit of Robert Greenberg, submitted after the hearing on the pending motions should be stricken because the affidavit improperly seeks to introduce testimony that varies from the language of documents produced during the course of discovery.  The court need not resolve this issue because Plaintiffs will be required at trial to submit actual proof that the party seeking indemnity for any cost actually and reasonably incurred that cost.

Plaintiffs paid an indemnifiable expense. The court does not believe that either Party advances the proper standard to be applied.

{59} The court concludes that each of the three categories of claims is governed by its own limitations period, but once that limitations period for a particular category began, it governs all subsequent costs and expenses falling within that claim category. Specifically, the Tank Collapse Claims accrued and the limitations period began to run on those claims on the date of the Tank Collapse on August 3, 2005, the IBRC Litigation Claims accrued and the limitations period began to run on the date that GR&S Hotel paid the IBRC Settlement Contribution, and the Legacy Repairs Claims accrued and the limitations period began to run on the first date that GR&S Hotel made a payment in excess of the Budget Amount.

1.  The Claims are Severable So That Applying Different Limitations Periods is Appropriate

{60} There are several established principles North Carolina courts use in applying statutes of limitations. The general rule as to breach of contract actions is that "the statute of limitations period begins to run as soon as the injury becomes apparent or should reasonably become apparent. Further damage incurred after the date of accrual is only an aggravation of the original injury and does not restart the statutory limitations period." *ABL Plumbing & Heating Corp. v. Bladen Cnty. Bd. of Educ.*, 175 N.C. App. 164, 168, 623 S.E.2d 57, 59 (2005) (internal citations and quotation marks omitted). "A cause of action generally accrues and the statute of limitations begins to run as soon as the right to institute and maintain a suit arises," but "[i]n no event can a statute of limitation begin to run until plaintiff is entitled to institute an action." *Penley v. Penley*, 314 N.C. 1, 20, 332 S.E.2d 51, 62 (1985). Once the cause of action has accrued, however, the limitations period begins to run even when the injury suffered at that time is slight. *Mast v. Sapp*, 140 N.C. 533, 537–40; 53 S.E. 350, 351–52 (1906).

{61} The general rule may be different for contracts which envision a continuum of payments or obligations, the most obvious examples being installment

contracts or credit accounts with periodic payments. There, each failure to pay is considered a separate breach and a new limitations period may commence each time a payment is not made. *See, e.g., Martin v. Ray Lackey Enters., Inc.*, 100 N.C. App. 349, 357, 396 S.Ed.2d 327, 332 (1990).

{62} North Carolina has applied this notion of separate limitations periods in the context of an insurer's duty to defend, so that a separate limitations period begins each time an insured pays legal expenses on a claim for which the insurer wrongfully denied a defense. *See Duke Univ. v. St. Paul Mercury Ins. Co.*, 95 N.C. App. 663, 672, 384 S.E.2d 36, 41 (1989).

{63} As for indemnification contracts, "North Carolina follows the general rule that a cause of action on an obligation to indemnify normally accrues when the indemnitee suffers an actual loss." *Schenkel & Schultz, Inc. v. Herman F. Fox & Assocs., P.C.*, 180 N.C. App. 257, 267, 636 S.E.2d 835, 842 (2006), *aff'd*, 362 N.C. 269, 658 S.E.2d 918 (2008). The right to sue, to be indemnified, or to have payment made because of derivative liability incurred does not accrue until the payment has been made. *Hager v. Brewer Equip. Co.*, 17 N.C. App. 489, 491, 195 S.E.2d 54, 55–56 (1973). But, if a contract provides both for performance to be rendered and for indemnity for liability suffered by claims from other parties, separate limitation periods may apply. *Premier Corp. v. Econ. Research Analysts, Inc.*, 578 F.2d. 551, 554 (1978).

{64} Under these precedents, the question then arises whether the court must impose a single limitations period that governs any claim under the Indemnity Agreement, or instead whether separate limitations periods should govern the separate categories of claims. The answer depends on whether the Indemnity Agreement should be construed as a single entire contract or as a severable contract including multiple undertakings.

{65} Writing for the appellate panel, Judge Geer summarized the distinction between general and severable contracts as follows:

> 'A contract is entire, and not severable, when by its terms, nature and purpose it contemplates and intends that each and all its parts,

material provisions, and the consideration, are common each to the other and independent.' On the other hand, 'a severable contract is one in its nature and purpose susceptible of division and apportionment, having two or more parts, in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other, nor is it intended by the parties that they shall be.' When a contract is severable, 'an action may be maintained for a breach of it in one respect and not necessarily in another, or for several breaches, while in other material respects it remains intact.'

*Kornegay v. Aspen Asset Grp., LLC*, 204 N.C. App. 213, 226, 693 S.E.2d 723, 734 (2010) (citations omitted).

{66} The court concludes that the contract undertakings are severable and the different categories of claims accrued at different times, with the Tank Collapse Claims accruing at the time of the Tank Collapse, the IBRC Litigation Claims accruing when the IBRC Settlement Contribution was paid, and the Legacy Repair Claims accrued when the Legacy Repair expenses incurred first exceeded the Budget Amount.

{67} As to costs or attorneys' fees included among the Tank Collapse Claims, the court believes that such expenses paid after August 3, 2005 were simply an aggravation of the loss, and are governed by the limitations period which began on August 3, 2005.

{68} As to the IBRC Litigation Claims, recoverable attorneys' fees or costs, if any, are restricted to those incurred within three years of the filing of the instant suit.

2. <u>Whether the Tank Collapse Claims Are Time-barred Depends on Whether GR&S Retained Those Claims When Executing the General Assignment, Which Raises Contested Issues of Material Fact for Trial</u>

{69} If not tolled, the limitations period for the Tank Collapse Claims began on August 3, 2005 and expired on August 3, 2008. GR&S contends that the running of the period was tolled by the filing of the Carteret County Action and that the present suit is timely because it was brought within one year after the Carteret

County Action was dismissed without prejudice. Defendants contend that the Carteret County Action is irrelevant because GR&S had assigned the Tank Collapse Claims to GR&S Hotel before filing the Carteret County Action. The statute of limitations defense then depends upon whether GR&S retained the Tank Collapse Claims when executing the General Assignment.

{70} As explained more fully below, the court determines that the contract language is ambiguous and that the issue of whether GR&S retained the Tank Collapse Claims presents issues of fact which must be resolved at trial.

{71} "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations. Thus, if there is uncertainty as to what the agreement is between the parties, a contract is ambiguous." *Schenkel & Schultz, Inc.*, 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008).

{72} The General Assignment provides in pertinent part that it assigns to GR&S Hotel:

> (iii) those services contracts, maintenance contracts, purchase orders, leases, and all other contracts or agreements, . . . with respect to the ownership, maintenance, operation, provisioning, or equipping of the Hotel, or any of the Property, as well as written warranties and guaranties relating thereto, if any, (iv) all licenses, franchises, and permits, certificates of occupancy, authorizations, and approvals used in or relating to the ownership, occupancy, or operation of any part of the Property . . . (vii) all accounts receivable with regard to the Property . . . (viii) all contract rights, leases, concessions, trademarks, logos, tradenames (including, without limitation, the name 'Sheraton Atlantic Beach Hotel' (but only to the extent Assignor has any rights with respect to such name)[)], used in connection with the operation of the Property and related applications and registrations, if any, copyrights, goodwill, assignable warranties, and other items of intangible personal property relating to the ownership or operation of the Hotel, <u>but excluding refunds, rebates, or other claims, or any interest thereon, for periods or events occurring prior to the date hereof, utility and similar deposits, prepaid insurance or other prepaid items, or prepaid license and permit fees.</u>

(underlining added).

{73}    Both subsections (iii) and (viii) refer to contracts which are being assigned, but the General Assignment does not refer specifically to the Indemnity Agreement.  Arguably, the Indemnity Agreement was assigned either under subsection (iii) or subsection (viii).  Subsections (iv) and (vii) include their own exceptions, which Defendants suggest means that subsection (viii) was intended to have its own exception.  However, the court concludes it is not clear whether the exclusionary language following subsection (viii) was intended as a specific exclusion applicable only to subsection (viii) as Defendants contend, or was instead intended as a general exclusion applicable to the entire paragraph and all its subsections, as Plaintiffs contend.  Defendants argue that because Plaintiffs admitted in discovery that the Indemnity Agreement was assigned pursuant to subsection (iii), and the exclusionary language following subsection (viii) must be limited to subsection (viii), the Tank Collapse claims were not excluded and were assigned.  Plaintiffs contend that the exclusionary language, although immediately following subsection (viii), applies to the entire paragraph and each of its subsections, so that it is irrelevant whether the Indemnity Agreement was assigned pursuant to subsection (iii) or subsection (viii).  Alternatively, they argue that they are not precluded from asserting that the Indemnity Agreement was assigned pursuant to subsection (viii), such that the Tank Collapse Claims were excluded and were retained by GR&S because of the exclusion of subsection (viii).

{74}    Defendants contend that the court should apply the reasoning of *Novant Health, Inc. v. Aetna U.S. Healthcare*, where Judge Tennille wrote:

> [Under] the doctrine of the last antecedent, relative and qualifying words, phrases, and clauses ordinarily are to be applied to the word or phrase immediately preceding and, unless the context indicates a contrary intent, are not to be construed as extending to or including others more remote.

2001 NCBC LEXIS 1 (N.C. Bus. Ct. 2001) at *17–18.

{75}    In response, Plaintiffs stress that Judge Tennille also recognized that the doctrine of the last antecedent does not apply where "the context indicates a

contrary intent . . ." *Id.*

{76} In discussing the doctrine of the last antecedent as applied to statutory interpretation, the United States Supreme Court stated that, "[w]hile this rule is not an absolute and *can assuredly be overcome by other indicia of meaning*, we have said that construing a statute in accord with the rule is quite sensible as a matter of grammar." *Barnhart v. Thomas*, 540 U.S. 20, 124 S.Ct. 376 (2003) (emphasis added).

{77} Plaintiffs urge that applying the doctrine of the last antecedent would place the various clauses of the General Assignment in disharmony, particularly because the scope of the exclusionary language following subsection (viii) is much broader than the subject matter described in subsection (viii) itself. Alternatively, Plaintiffs urge that subsection (viii), if read broadly enough to match the breadth of the exclusionary language, must also be read broadly enough to bring the Indemnity Agreement within the "contracts" of subsection (viii).

{78} The court concludes that the doctrine of last antecedent does not lead here to a single clear contract interpretation. Rather, there is a contractual ambiguity that precludes summarily determining the scope of the exclusion as a matter of law. The issue of whether GR&S retained the Tank Collapse Claims when executing the General Assignment must be reserved for trial.

{79} Accordingly, the determination of whether the Tank Collapse Claims are barred by the statute of limitations must be RESERVED. If the Tank Collapse Claims were retained by GR&S, they were timely brought by GR&S when it filed the Carteret County Action, and were timely reinstituted after the Carteret County Action was dismissed without prejudice. If the Tank Collapse Claims were instead assigned to GR&S Hotel, they are now time-barred.

3. The Legacy Repairs Claims Were Timely Filed

{80} Neither Plaintiff had the right to institute suit on the Legacy Repairs Claims pursuant to Sections 3 and 4 until such time as the respective Plaintiffs paid

for repairs which exceeded the Budget Amount.  It necessarily follows that the limitations period did not begin to run against the Legacy Repairs Claims until GR&S Hotel first made a payment in excess of the Budget Amount.

{81}    Plaintiffs contend that GR&S Hotel first made a payment in excess of the Budget Amount when it made a $100,000.00 payment on May 15, 2008.  (Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. 6.); (Aff. of Alfred Frazzini ¶ 72.) The present lawsuit was brought on April 15, 2011.  The Legacy Repairs Claims are not barred by the statute of limitations and Defendants' Motion for Summary Judgment as relating to those claims is DENIED.


4.    The IBRC Litigation Claims Were Timely Filed

{82}    The IBRC Litigation Claims did not accrue until Plaintiffs had the right to sue to recover for payments made, which occurred when the IBRC Settlement Contribution was paid on April 13, 2011.  Accordingly, the IBRC Litigation Claims were timely filed and Defendants' Motion for Summary Judgment as relating to those claims is DENIED.


D.  Recovery of Ancillary Fees

{83}    By their Motion, Defendants again ask the court to eliminate any claim for attorneys' fees for lack of any statutory authority allowing their recovery, or alternatively to the extent that Section 6.21.2 authorizes the recovery of attorneys' fees, they must be capped at fifteen percent of total indebtedness.

{84}    For the reasons stated in its September 29, 2011 Order, the court reaffirms its conclusion that the Indemnity Agreement constitutes an "evidence of indebtedness" within the purview of Section 6.21.2, and that if fees are recoverable solely pursuant to statute, they must be capped.

{85}    The court also incorporates its discussion of prior precedents as applied to Ancillary Fees in its earlier September 29, 2011 Order.  The court has, however, further considered the issue in light of subsequent discussion of the recovery of

attorneys' fees by the North Carolina Court of Appeals in *Robinson v. Hope*, ___ N.C. App. ____, 719 S.E.2d 66 (2011). It is clear for policy reasons that Direct Fees cannot be recovered absent such statutory authority, even with an express contractual agreement.

{86}    There has been no relevant statutory change since the court's earlier order. Further, the court does not believe that there has been any significant factual record developed in discovery that suggests any different analysis than the court followed in its earlier order.

{87}    The court agrees that *Robinson* did not squarely pose the issue of whether a party can recover Ancillary Fees on the basis of an express agreement without further statutory authority. In *Robinson*, the parties did not have an agreement allowing attorneys' fees. Rather, the issue in *Robinson* was whether attorneys' fees in ancillary litigation occasioned by a tortfeasor's wrong could be recovered as an element of tort damages. The issue is one of contract, not tort, and the issue is not whether attorneys' fees may be imposed as tort damages or taxed as costs, but whether they fall within the permissible recovery for a bargained-for promise.

{88}    The discussion in *Robinson* did, however, include some limitations of which this court must be cognizant. *Robinson* unsurprisingly instructs that this court has no authority to create such a policy-based exception to the general rule prohibiting the recovery of attorneys' fees, and that, in fact, the Court of Appeals itself does not have that power. *Id.* at _____, 719 S.E.2d at 69.

{89}    *Robinson* considered, and expressly and clearly rejected the concept of allowing attorneys' fees incurred in third party litigation as tort damages which has been adopted by other jurisdictions and is embodied in the *Restatement Second of Torts* § 914(2). To the extent that Ancillary Fees in this case must be characterized as "costs" or "damages," even though they were incurred in litigation with third parties, *Robinson* more closely predicts that the North Carolina appellate courts would find they fall within the general prohibition discussed in *Stillwell Enterprises, Inc. v. Interstate Equip. Co.*, 300 N.C. 286, 289, 266 S.E.2d 812, 814–15

(1980). The question then is whether this court properly views the claim for Ancillary Fees grounded in contract to be something other than "damages" or "costs" as those phrases are used in the appellate precedents.

{90}   The court continues to believe that the issue is not squarely resolved by precedent. But, it also believes that adopting Plaintiffs' position is made more difficult by *Robinson.*

{91}   The court urges that the issue of Ancillary Fees as an element of recovery should not be allowed to infect the trial on other contested issues. The court then encourages the Parties, if possible, to reduce the issue to one of law by stipulating as to the amount of Ancillary Fees that should be recovered, if they are recoverable at all. If there are contested issues as to the amount of attorneys' fees actually and reasonably incurred, the court will then consider segregating that claim through a special jury interrogatory.

{92}   The court elects to reserve its final ruling on the issue of Ancillary Fees and concludes as follows:

a.   if the amount of Ancillary Fees is not contested, the issue of whether Ancillary Fees may be recovered is one of law, not fact, and the court will issue its ruling at a later time, more likely than not in Plaintiffs' favor with some concern whether an appellate court would agree;

b.   if the amount of Ancillary Fees actually and reasonably incurred is contested, there are fact issues that preclude summary judgment.

CONCLUSION

{93}   For the foregoing reasons, Defendants' Motion is DENIED IN PART and RESERVED IN PART. Plaintiffs' Motion is GRANTED IN PART and RESERVED IN PART.

{94}   The Parties are directed to confer and present two dates on which they would be available and prepared for a status conference to be held at the North

Carolina Business Court, 211 N. Greene Street, Greensboro, NC 27401, for purposes of finalizing a schedule for necessary pre-trial preparations and trial consistent with this Order.

IT IS SO ORDERED, this 10th day of October, 2012.